MOSES GROVES AND JAMES GRAHAM, PLAINTIFFS IN ERROR, *v.* ROBERT SLAUGHTER, DEFENDANT IN ERROR.

JOHN W. BROWN, MOSES GROVES, R. M. ROBERTS, AND JAMES GRAHAM, PLAINTIFFS IN ERROR, *v.* ROBERT SLAUGHTER, DEFENDANT IN ERROR.

An action was instituted in the Circuit Court of Louisiana, on a promissory note given in the state of Mississippi, for the purchase of slaves in that state. The slaves had been imported in 1835–1836, as merchandise, or for sale, into Mississippi, by a non-resident of that state. The constitution of Mississippi, adopted on the 26th October, 1832, declared that the introduction of slaves into that state, as merchandise, or for sale, shall be prohibited from and after the first day of May, 1833. The parties to the note contended, in the Circuit Court, that the contract was void; asserting that it was made in violation of the provision of the constitution of Mississippi, which, it was insisted, was operative after May 1, 1833, without legislative enactment to carry the same into effect. Held, that the prohibition of the constitution did not invalidate the contract, but that an act of the legislature of the state was required to carry it into effect; and no law on the subject of the prohibition in the constitution, was passed until 1837.

The construction of the provision in the constitution of Mississippi, relative to the introduction of slaves for sale, into that state, has not been so fixed and settled by the Courts of Mississippi, as, to preclude the Supreme Court of the United States from regarding it as an open question.

The language of the constitution obviously points to something more to be done; and looks to some future time, not only for its fulfilment, but for the means by which it was to be accomplished. But the mere grammatical construction ought not to control the interpretation, unless it is warranted by the general scope and object of the provision.

Under the constitution of Mississippi, of 1817, it is declared that the legislature shall have power to prevent slaves being brought into the state as merchandise. The time and manner in which this was to be done, was left to the discretion of the legislature; and, by the constitution of 1832, it is no longer a matter of discretion when this prohibition is to take effect; but the 1st day of May, 1833, is fixed on as the time, before which the prohibition shall not operate. But there is nothing in this provision which looks like withdrawing the whole subject from the action of the legislature. On the contrary, there is every reason to believe, from the mere naked prohibition, that it looked to legislative enactments to carry it into full operation; and, indeed, this is indispensable. There are no penalties or sanctions provided in the constitution, for its due and effectual operation. The constitution of 1832 looks to a change of policy on the subject, and fixes the time when the entire prohibition shall take effect; and it is a fair and reasonable conclusion, that it was the only material change from the constitution of 1827.

2 F 2                              57

Admitting the constitution is mandatory, upon the legislature, and that they have neglected their duty in not carrying it into execution, it can have no effect upon the construction of this article. Legislative provision is essential to carry into effect the object of the prohibition. It requires the sanction of penalties to accomplish this object.

What would become of the slaves thus introduced, if the construction is such as to give the provision immediate operation? Will they become free immediately, on introduction, or do they become forfeited to the state? These are questions not easily answered; and although these difficulties may be removed by subsequent legislation, yet they are proper circumstances to be taken into consideration, when inquiring into the intention of the convention, in forming the constitution. It is unreasonable to suppose, that if this prohibition was intended to operate, per se, without any legislative aid, that there would not have been some guards and checks thrown round it, to insure its execution.

The proviso in this article, that actual settlers shall not be prohibited from bringing in slaves for their own use, until the year 1845, must, necessarily, be considered as addressed to the legislature, and must be construed as a restriction on their power. The enacting part of the article, "shall be prohibited," is also addressed to the legislature, and is a command to do certain acts. The legislative enactments on this subject strongly fortify the conclusion, that this provision in the constitution was not understood but as directory to the legislature.

The enactment of a law in 1837, to carry the provision of the constitution into effect by imposing penalties, from and after the passing of the law, shows the sense of the legislature on the subject; and that, in the opinion of the legislature, such a law was necessary. The laying of a tax on slaves brought into the state for sale after May first, 1833, also shows that the provision in the constitution was not considered in operation without some legislative provisions to carry it into effect.

To declare all contracts made for the purchase of slaves, introduced as merchandise, or for sale, from the first of May, 1833, until the passage of the law of 1837, illegal and void; when there was such an unsettled state of opinion and course of policy pursued by the legislature; would be a severe and rigid construction of the constitution; and one that ought not to be adopted, unless called for by the most plain and unequivocal language.

The Court do not mean to say, that if there appeared to have been a fixed and settled course of policy in the state of Mississippi, against allowing the introduction of slaves, as merchandise, or for sale, after the first day of May, 1833, that a contract made in violation of such policy would not be void. But the Court cannot think that this principle applies to this case; as, when the sale of the slaves in question was made there was, certainly, no fixed and settled course of policy which would make void or illegal such contracts.

IN error from the Circuit Court of the United States for the Eastern District of Louisiana.

In the first case, the defendant in error, on the 11th day of February, 1839, had instituted a suit, by petition, in the Circuit

[Groves et al. *v.* Slaughter.]

Court of Louisiana, against the plaintiffs in error, on a promissory note for the sum of seven thousand eight hundred and seventy-five dollars, dated at Natchez, on the 20th of December, 1836, payable at the Commercial Bank at Natchez, drawn by John W. Brown to the order of, and endorsed by R. M. Roberts, and also endorsed by Moses Groves and James Graham, payable at the Commercial Bank at Natchez twenty-four months after date; which note had been regularly protested for non-payment.

In the second case, the suit had been instituted on the 5th day of April, 1838, on a promissory note for seven thousand dollars, also drawn by John W. Brown, payable at the Commercial Bank at Natchez, to R. M. Roberts, or order, at Natchez, and endorsed by him and the other plaintiffs in error, dated 20th December, 1836, payable and negotiable twelve months after date, and regularly protested for non-payment.

The answers of the plaintiffs in error, in both the cases, stated that the notes were given by the drawer, Brown, to the plaintiff, in part payment of the price of certain slaves purchased by him from the plaintiff, and the notes were given at Natchez, in the state of Mississippi, on or about the day of their dates, respectively. That the petitioner, Robert Slaughter, did introduce into the state of Mississippi, after the first day of May, 1833, the slaves for which the notes were given, as merchandise, and for sale; and did sell the slaves, so imported, to the said Brown; and did take, in part payment thereof the said notes, which had been endorsed in blank by the respondents to accommodate the said Brown.

The respondents alleged that the cause or consideration for which the notes were given is null and void, the notes are null and void, and of no effect; because the contracts on which they are founded are in direct violation of the constitution of the state of Mississippi, which expressly prohibits the introduction of slaves into that state, as merchandise or for sale, after the first day of May, 1833.

Afterwards, on the 14th of June, 1839, the following agreement was filed, in each of the cases, as a statement of facts by the parties.

"In this case it is consented that the question of fraud is waived by defendants, except as hereinafter reserved; the case

is to be defended solely on the question of the legality and validity of the consideration for which the notes sued on were given. It is admitted, that the slaves for which said notes were given, were imported into Mississippi, as merchandise, and for sale, in the year 1835 and 1836, by plaintiff, but without any previous agreement or understanding, express or implied between plaintiff and any of the parties to the note, but for sale generally, to any person who might wish to purchase. The slaves have never been returned to plaintiff, nor tendered to him by any of the parties to the notes sued on."

The constitution of the state of Mississippi, adopted in 1832, provided, in the 2d section, title " slaves," as follows:

" The introduction of slaves into this state, as merchandise, or for sale, shall be prohibited from and after the first day of May, 1833: provided, the actual settler or settlers, shall not be prohibited from purchasing slaves in any state in this Union, and bringing them into this state for their own individual use, till the year 1845."

The cases were argued by Mr. Gilpin and Mr. Walker, for the plaintiffs in error; and by Mr. Jones, Mr. Clay, and Mr. Webster, for the defendants.

Mr. Gilpin, for the plaintiffs in error.

This is a case which involves but a single question, yet, that it is one of surpassing interest, is proved by the ability with which it has been discussed, the zeal and eloquence with which every position in relation to it has been scanned. The simple and single inquiry is, whether a contract, directly opposed to a constitutional provision, not accompanied with any legislative action, will be carried into effect by the judicial tribunals.

The first constitution of the state of Mississippi, was adopted on the 15th of August, 1817, and solemnly approved by Congress, (3 Story's Laws, 1716,) and by the President, on the 10th December of the same year. In its article entitled " slaves," was this provision: " The general assembly shall have no power to prevent emigrants to this state from bringing with them such persons as are deemed slaves by the laws of any one of the United States, so long as any persons of the same age or de-

scription shall be continued in slavery by the laws of this state: provided, that such person or slave be the bona fide property of such emigrants." And afterwards, the same article continues, " They shall have full power to prevent slaves from being brought into this state as merchandise."

In the year 1822, a law was passed, (Revised Code of Miss. 155,) declaring that if slaves were brought for sale, he who brought them must have a certificate, made before certain persons, of the place from which they came, to serve as evidence of their good character; and a severe penalty was imposed for a violation of it.

In the same year a law was passed, (Revised Code of Miss. 154,) declaring that persons held to service for life, in other states, and brought into the state of Mississippi, pursuant to law, and no others, should be deemed slaves.

On the second Monday of September, 1832, a convention met at Jackson, to amend the state constitution. The very first amendment proposed by the committee was to alter the article "slaves," by striking out the words, that the legislature "shall have power to prevent slaves being brought into this state as merchandise," and to insert in lieu of them, " the introduction of slaves into this state, as merchandise, shall be prohibited after the — day of —— 18—."

As soon as it came up for discussion, it was proposed to date the prohibition from May, 1833. It was moved to make it 1899. The former was adopted. It was then proposed to add, that "no law shall be passed before 1850, to prevent any citizen of the state from purchasing and bringing in slaves for his individual use." This also passed. In the subsequent stages of the proceedings of the convention, the subject became matter of long debate, and was finally referred to a committee, of which Judge Trotter was a member, who reported the clause as it had stood before; leaving to the legislature the power to prevent the importation of slaves as merchandise. To this, a clause was moved as an amendment, in the words now forming a part of the constitution, and adopted by a vote of twenty-six to seventeen; Judge Trotter and Governor Lynch both voting against it. That clause, thus adopted in lieu of that which was in the constitution of 1817, is in the following words: " Section 2. The introduction of slaves

into this state, as merchandise, or for sale, shall be prohibited from and after the 1st day of May, 1833: provided, that the actual settler or settlers shall not be prohibited from purchasing slaves in any state of this Union, and bringing them into this state for their own individual use, until the year 1845."

The constitution also went on to declare, that all laws then in force, not repugnant to the constitution, should continue to operate till they expired by their own limitation, or till they should be repealed.

On the 2d of March, 1833, the legislature being in session, passed a law to submit to the people an amendment of the new constitution, to restore to the legislature power to regulate this subject, without the restraint of a constitutional provision. They enacted, (Laws of Mississippi, 478,) "that the second section of the seventh article of the constitution of the state, under the title or head "Slaves," be so altered, changed, and amended, as to read as follows, viz.: Section 2. The legislature of this state shall have, and are hereby vested with power to pass, from time to time, such laws, regulating or prohibiting the introduction of slaves into this state, as may be deemed proper and expedient." To make this law effectual to change the constitution, it was necessary that it should be approved by a majority of the citizens of the state, qualified to vote for members of the legislature. This was not done, and the clause in the constitution, therefore, remained as it was adopted in 1832.

When, on the meeting of the legislature, it was found that this proposed amendment was not adopted, the Senate passed a bill again to submit it in exactly the same terms, to the people; thus showing that, in their opinion, a constitutional sanction was necessary to enable the legislature to regulate the subject. The House refused to concur in this; but both bodies united in passing the law of the 23d of December, 1833, (Laws of Mississippi, 525,) to tax venders of slaves. A more certain indication that this law was not meant to apply to importers of slaves for sale, but solely to citizens and residents who had occasion to vend them, could not be given. The House, at the same session, introduced a bill to provide penalties in aid of the constitutional prohibition. It did not then pass, but it became a law on the 13th of May, 1837, which, owing to the biennial sessions of the legis-

lature, and the omission to hold one at the following regular term, was, in fact, at the next meeting of that body. This law (Laws of Mississippi, 758) enforced the prohibition of importations for sale by severe penalties, declaring that any persons who should introduce or import slaves into the state, as merchandise, should be guilty of a misdemeanor, and be fined and imprisoned.

In the year 1835, or 1836, as stated in the record, Robert Slaughter, the defendant in error, introduced into the state of Mississippi a number of slaves. It is admitted, and makes part of the case, that they were so introduced and imported, "as merchandise, and for sale." They were purchased at Natchez, in Mississippi, on the 20th of December, 1836, by a person of the name of Brown, who had received two certain accommodation notes endorsed for his use by the plaintiffs in error, Groves and Graham. In payment for the slaves purchased from Slaughter, he gave him the two notes so endorsed, one for seven thousand dollars, payable in twelve months after date; the other for seven thousand eight hundred and seventy-five dollars, payable in twenty-four months after date. It is admitted, that this proceeding took place without any agreement or understanding, express or implied, between the two endorsers who now prosecute this writ of error, and the parties to the note.

When the notes became due, the endorsers refused to pay them, or in any way to become parties to a transaction which was in direct violation of the laws of Mississippi, and suits were instituted against them in the Circuit Court of Louisiana. Evidence appears to have been taken relative to fraud and collusion charged; but it was finally agreed to waive that question, and to leave the case to depend upon the legality and validity of the notes which were the consideration of the plaintiff's claim.

The District-Judge, sitting as a Circuit Judge in the Court below, having decided that they were a valid consideration, upon which the plaintiff could recover, the correctness of that decision is now to be examined.

It will thus be seen, that Slaughter, in the year 1836, and in the state of Mississippi, sold to Brown slaves introduced by him, as merchandise, and for sale, into that state, in the year 1835, or 1836; and that he received in payment therefor, these notes, endorsed by Groves and Graham, and still holds them.

Is this such a legal, valid, and binding contract between these endorsers and the holder of the notes, as a Court of Justice will enforce? To make a contract legal, valid, and binding, it is not sufficient that there should be an agreement on one side, to do a particular act, as to pay a certain sum of money, on a certain day; out that the consideration of this agreement, or the act for obtaining the performance of which it is made, should be, in itself, legal and sufficient. Plowden, 5, 6, 17. 5 East, 16. 7 Durn. and East, 350. The act to be performed in this case was the completion of a transaction, in direct violation of a provision in the constitution of the state of Mississippi, the place of contract. It was, that Slaughter would sell to Brown, slaves imported by him into that state, in 1835, or 1836, for the express purpose of selling them; Slaughter thus selling them, and Brown thus receiving them. in the face of the constitutional provision.

No language can make such a transaction more certainly illegal, than that used in the present constitution of Mississippi. It is an absolute and positive prohibition, going into full effect on the 1st of May, 1833, and making, from that time, the introduction of slaves for the purpose of sale, a direct violation of the fundamental law of that state. An attempt has been made, on the argument of the case in this Court to avoid the force of this language, by construing it into a direction for future action by the legislature, instead of regarding it as a present and positive command, deferred only in its operation for a few months. But this construction cannot be sustained either by the language of the clause itself, or by a reference to the language of other sections of the constitution; or by a comparison with the provisions of the previous constitution of the state, and the acts of its legislature; or by the construction given to similar language, in other laws and public acts; or by the judicial interpretation of this identical clause, by every tribunal of the state of Mississippi.

There is nothing in the language of the section which contemplates future action to constitute the prohibition; what is future relates merely to the time when the prohibition is to take effect. Not intending to enforce immediate prohibition, present words could not be used. To say that a thing is now prohibited,

which is now permitted, involves great inaccuracy of language. If, as was no doubt the case, the people of Mississippi intended that a person might introduce slaves for sale until the 1st of May, 1833, but that on that day his right to do so should cease; it seems difficult to imagine how they could have expressed their intention in clearer language. They forbade it. There is nothing in forbidding a thing to be done which requires future action. Future action may be necessary to punish a violation of the prohibition; but that is a matter totally different from the prohibition itself. The act of the legislature in 1837 makes a violation of this prohibition an offence punishable by fine and imprisonment, but this is not the prohibition—that is already complete. Suppose this act of the legislature, instead of imposing a fine and punishment, had gone no farther than the constitution itself has done, and had enacted that such importation should be prohibited after a certain day, will it be contended that when that day arrived a still further law was necessary? A law containing no penalty for transgression may be defective in its operation on the individual, but it is complete to establish the nature of the offence. In Mississippi a traffic in slaves existed which the people of that state desired to stop. They declared that it should stop after a certain day. They do not say a law shall be passed to stop it, but they say it shall stop. If they had intended to leave it to future legislation, they would have said "may" be prohibited; but they do not do so. They declare that the act shall cease on that day. No legislative action is necessary to complete the prohibition; it is at best surplusage; it can do again only what the convention has done before; it can only say, as the constitution has said, this traffic shall stop; if any thing was to be done on the 1st of May, legislative action might be necessary; where there is nothing to be done, it cannot be. And how fatal would be the consequence if it were otherwise; if legislation is necessary to the prohibition, it may be refused; and thus we have that actually done which the words of the constitution forbid to be done.

If we were even to admit (for the sake of argument) that something is requisite to make the prohibition complete on the 1st of May; still, what is there to require it to be legislative action? It is said that the introduction of slaves must be pro-

hibited on that day " by law." What authorizes the insertion of those words? Why not fill the hiatus with the words " by this constitution;" or, " by the action of the Courts?" To assume there is a blank to be filled, and then to fill it in the manner best suited to the case of the plaintiff, may be an easy way to make the constitution favourable to his construction of it, but can hardly be regarded the proper mode of interpreting a written instrument. It is submitted, then, that this is, by its terms, an absolute prohibition, existing, proprio vigore, on and after the 1st of May, 1833.

The constitution of Mississippi is full of phrases which illustrate and confirm this view of the section in question. It declares, that " the exercise of religious worship shall be free to all persons." Is a law necessary to carry this declaration into effect? It is true that, without a subsequent law, he who interferes with the exercise of another's worship may not be punished, but surely the privilege is derived, or the right is acknowledged, not under the law, but under the guaranty of the constitution, which is complete. So there are numerous prohibitory provisions, directing that warrants shall not be issued without certain prerequisites; that property shall not be taken, except in certain cases; that offices shall not be held beyond a limited term; that persons guilty of bribery shall be disqualified from holding office; all these have a future phraseology, especially the latter; yet it will hardly be contended that the prohibition was not absolute and complete without any further law. On the other hand, where future legislation is necessary, it is so provided. It is said " the judges of all Courts shall be conservators of the peace, and shall be, by law, vested with ample powers." The authority is present and immediate; the particular powers are to come from future legislation; and, in that case, it is so declared. Again, in the clause which, per se, disqualifies for bribery, it is provided that the legislature may disqualify for crime. Numerous similar clauses, contemplating future legislative action, may be cited. But perhaps the strongest illustration is in the very article on " slaves." In that, all the acts contemplated are future; yet some of them are to result from legislation, (Rev. Stat. 34, 35;) some spring directly from the constitution. Is it possible that this distinction is without

meaning? Is it possible that the constitution should permit a discretion to the legislature in one clause of a section, omit it in another, and permit it again in a third, without evidently intending to make that distinction which is apparent from its letter.

The inference which thus results from the language of this provision, and from a comparison of it with that used in other parts of the same instrument, becomes more certain when we examine the proceedings of the convention that framed the constitution, and of the legislature in regard to the clause in question. The former constitution made this prohibition a future legislative act, just as it left the provisions in regard to the emancipation and treatment of slaves to be matters of legislation. This was the only power in regard to slaves which the amended constitution did not continue with the legislature. By what proper inference can we suppose they intended it should remain with that body? The former constitution gave it to the legislature; the people altered the clause that did so; of course they meant to establish the provision, independently of its action. So they declared the prohibition should go into operation on the 1st of May, 1833. Did they fix that early day, before which but one short session of a legislature could occur; and yet give it an option to defeat their express provision? Had they intended to do so, would they not have used the language used in the Constitution of the United States, when they did intend to leave this option to Congress; the importation "shall not be prohibited by the Congress prior to the year 1800?" Const. I. 9. So, when the legislature desired to prevent the prohibition from taking effect, they passed a law to obtain an amendment of the new constitution, although it had not yet gone into operation, so as to restore this subject to the legislature, and permit them to enforce the prohibition by law at their discretion; a change which the people refused to confirm. Had that legislature considered any further law necessary to enforce this prohibitory clause, their proposed amendment was totally superfluous.

This idea, that the use of a phrase relating to a future event, necessarily requires future action, has been repudiated more than once by this Court; and that not only in cases which, by merely prohibiting a thing to be done, do not and cannot require a direct act, but in cases where a positive and affirmative result was

[Groves et al. *v.* Slaughter.]

to arise from the language used. In the case of the Florida treaty this Court said: "although the words 'shall be ratified and confirmed' are properly words of contract, stipulating for some future legislative act; they are not necessarily so. They may import that they 'shall be ratified and confirmed' by force of the instrument itself." It has been attempted to impair the effect of this declaration by referring to the previous construction of the same clause in the case of Foster and Elam *v.* Neilson, and to ascribe the change to a mere difference in the translation of certain Spanish words: but surely this view is not sustained. The question in both cases was decided on the whole scope of the treaty provision; on the extent to which a previous grant was valid after the cession; whether further legislation was or was not necessary. In Foster and Elam *v.* Neilson, it is true the majority of the Court held it to be so; but Chief Justice Marshall and another judge held that the words, "shall be confirmed," might be regarded as making the grants as complete under the government of the United States as under that of Spain. When, afterwards, in the cases of Arredondo and Percheman, the clause was more fully considered, with reference to the laws of nations and the whole scope and bearing of the treaty, this construction was given to them by the whole Court. It is true that the Spanish version is referred to; but this is not assigned as the reason of the change, but merely as evidence of the correctness of the later construction. At all events, it shows that the words "shall be" do not necessarily denote future action, where the scope and intent of the instrument give them a present and positive character. In the treaty of 1778 with France, it was stipulated that the subjects of France "shall not" be reputed to be aliens; and in the treaty of peace in 1783 with Great Britain, the ninth article provided that British subjects "shall continue" to hold lands; these clauses were held to confer a present right to hold property. Ware *v.* Hylton, 3 Dall. 235. The United States *v.* The Peggy, 1 Cranch, 109. So in the convention with France in 1801, the stipulation that property "shall be" restored was held to operate as an immediate restoration. 14 Peters, 412. If words, like these, forming a contract between two nations, instead of being, as a state constitution is, an ordinance, an act of supreme authority, a decree—if words in a

[Groves et al. *v.* Slaughter.]

treaty between two parties, providing for a thing to be done, can be construed, where such is the intention of the contracting parties, to have a present signification, who can doubt that these words, merely prohibitory in regard to the conduct of the citizen, are to be so construed?

And so has thought every Court of the state of Mississippi. In a succession of cases, the construction of this clause of the constitution has come before the different tribunals of that state. Each has decided that, so far as the construction of this clause was to be considered, it was unquestionably a prohibition, proprio vigore, of the act of importation for purposes of sale. Judge Nicholson, the presiding judge in one of the circuits of the state, is reported as having so decided, though we have not the case before us. Chancellor Buckner, in the case of Glidewell *v.* Hite, of which a MS. report has been read, decides that the contract of sale is valid, because it is only importation, not sale, which is prohibited: but he holds distinctly and unequivocally, that the prohibition (whichever it may be) is complete under the constitution, and not dependent on any subsequent legislative act. The clause in the constitution, he says, " points out, and defines what should constitute the evil or offence which the constitution intended to guard against and prohibit." " I mean to declare," says the Chancellor, afterwards, " that the moment the negroes were introduced as merchandise or for sale, the offence was at once complete; no further step was necessary, to bring it within the intent and meaning of the prohibitory clause of the constitution." " Suppose," he again observes, " that the defendants had been indicted under the clause of the constitution in question, would any thing have been necessary to sustain the prosecution, further than the single proof of the purpose of the act of introduction, accompanied with the proof of offering them for sale." But the Court of Errors, the highest tribunal of the state, was still more emphatic. The case of Green *v.* Robinson, was an appeal from a similar decision of Chancellor Buckner. He had decided in favour of the validity of the sale, on the ground that the prohibitory clause extended only to the importation; and also in favour of the defendant, because the plaintiff had neglected to avail himself, in a suit at law, of this defence. The Court of Errors, in reviewing the

[Groves et al. *v.* Slaughter.]

Chancellor's decision, use the following language : " That it is competent for the people in convention, to establish a rule of conduct for themselves, and to prohibit certain acts deemed inimical to their welfare, is a proposition which cannot be controverted. And such rule, and such prohibition will be as obligatory as if the same had been adopted by legislative enactment. In the former case, it is endowed with greater claims upon the approbation and respect of the country, by being solemnly and deliberately incorporated with the fundamental rules of the paramount law, and thus placed beyond the contingency of legislation. It is difficult to conceive in what better or more appropriate language the convention could have designated its will, or declared the principle of public policy intended to be enforced. It has been argued, that this provision in the constitution is merely directory to the legislature. This interpretation is opposed, as I conceive, to the plain language of the provision itself, as well as to the obvious meaning of the convention. It cannot surely be maintained, that this provision is less a prohibition against the introduction of slaves as merchandise, because it is not clothed with the sanction of pains and penalties expressed in the body of it. That belonged appropriately to the legislature. Their neglect or refusal to do so might lessen the motives to obedience, but could not impair the force of the prohibition. It cannot be doubted that, if the legislature instead of remaining inactive, had passed a law to authorize the introduction of slaves for sale, that such act would have been void."

The language thus used, which is conclusive as to the judgment and opinions of the judicial tribunals of Mississippi, was intended to settle, finally and decisively, the question of the validity of these contracts. It was not extra judicial, for, though the judgment of the Court depended on other grounds, yet this was expressly brought under their review. The Chancellor declared that his judgment was so given, as to "put the point in a train for ultimate decision," by the Court of Appeals. Nor should it be forgotten that the opinion was delivered by Judge Trotter, himself, as has been seen, not merely a member of the convention which inserted this very clause in the state constitution : but one of those who voted, and preferred to leave to the

legislature the authority of making the prohibition, instead of thus inserting it absolutely in the fundamental law.

It is submitted that, under the well established rule of this Court, these decisions of the judicial tribunals of Mississippi, are conclusive of the present controversy. No point is more authoritatively settled than that the construction given to the constitution and laws of a state, not conflicting with those of the Union, by the Courts of the state, will be adopted by this Court. Green *v.* Neale, 6 Peters, 295.

And how is it attempted to obviate this clear intention of the people of Mississippi, as derived from the plain letter of their constitution; from a comparison of this, with other language of that instrument; from a review of successive efforts made by them to effect this object; from that interpretation of their language which is consistent with the just and settled rules of construction; from the direct and authoritative exposition given by their own Courts of justice? How is it attempted to obviate this intention, thus expressed?

It has been done, by saying that the legislature of Mississippi regarded the clause of the constitution, in 1833, as merely permissive to the legislature; and that Governor Lynch, in 1837, so regarded it.

If this were so, would it be an answer? It was evidently the wish of the legislature to retain a power that the people had taken from them; they tried to obtain it by an amendment of the constitution; it is natural they should seek it, that mode failing, by ingenious interpretation. If it were so, their construction could avail nothing against that derived from the rules already stated. But it is not so. The act of March, 1833, shows, the legislature thought an amendment of the constitution necessary to prevent the immediate and positive operation of the prohibitory clause. The act of December, 1833, does not relate to those who imported slaves for sale, in violation of the law, but to transient merchants, or persons selling their own slaves.

As to the recommendations of Governor Lynch, they were to give effect to the provision by adequate penalties. The sales might be made for cash, the payment on delivery; in such case, all the evils he adverts to would occur, and the contract be completed, notwithstanding the prohibition. So, too, in cases where

[Groves et al. *v.* Slaughter.]

the person seeking to discharge himself was he, who received the slaves; a party to the illegal transaction; the Courts would not interfere on his behalf; and thus the provision of the constitution would be violated. Cases like the present, where the defendant is ignorant of the transaction, and, from that circumstance, could readily receive the aid of a Court, might be expected seldom to occur.

These objections, therefore, if they could have weight against such arguments as those presented to sustain the constitution of Mississippi, are not, in reality, when properly examined, objections to our construction of that instrument.

It may, then, be confidently said that, after the 1st of May, 1833, it was unlawful, by the constitution of Mississippi, to introduce slaves into that state for sale, or as merchandise.

Was such a provision in that constitution a legal one in itself?

A constitution is the will, deliberately expressed, of the whole people of a state; the most binding and solemn compact; original and organic; restrained in nothing which the people may desire to introduce, unless so restrained by the previous compact of the same people with their fellow-citizens of the rest of the Union.

If, then, it has been shown, that the people of Mississippi did prohibit the importation of slaves, as merchandise, after 1st May, 1833, that prohibition is binding and operative, unless it be contrary to the Constitution of the United States.

Is it so?

It is said that it is, because the Constitution gives to Congress the power "to regulate commerce with foreign nations, among the several states, and with the Indian tribes." Is the prohibition to import slaves into Mississippi, for sale within that state, such a regulation of commerce among the several states, as Congress had the sole authority to make? It is submitted—

1. That it is not a regulation of commerce among the states.

2. That if it were, it is one excepted from this power of Congress, and remains in the state.

3. That if it were vested in Congress, it may also be exercised by the state.

I. The regulation of commerce among the several states has been defined with such great simplicity, distinctness, and pre-

cision by Chief Justice Marshall, that it is useless to speculate upon it for ourselves. He says, in the case of Gibbons *v.* Ogden, 9 Wheaton, 194, "It is not intended to say that these words [to regulate commerce among the several states] comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient, and is certainly unnecessary. Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a state, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or subject of the sentence, must be the exclusively internal commerce of a state. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself."

Is it possible to conceive a case falling more clearly within this definition? Is not this a commerce carried on between man and man in the state of Mississippi? Is it not a matter that does not affect other states? Is it necessary for the general government to interfere for the purpose of executing its powers? It is the importation of a slave; the sale of a slave. His being a slave; his being a subject of sale, is a matter depending solely on the state of Mississippi. It is by the local law alone that the subject-matter of importation and sale is created. No other state is affected by its existence or non-existence. It is not necessary for any powers of the general government, that it should be able

to enforce this sale or this importation, unless it has the power not to regulate, but to create articles of commerce. It does not differ, in principle, from the very common prohibition against the introduction of lottery tickets, or of bank notes under a certain denomination. Whether these are, or are not articles passing in trade in a state, depends on her own laws. Could Congress, because they may be articles of traffic, deprive a state of her right to admit or exclude them? Suppose Mississippi had said, no negroes shall be sold as slaves within her limits; can Congress interfere, to abolish this, on the ground that it affects other states? That will not be contended; yet, if it cannot, then its interference to regulate the disposition of them—the manner in which they are to be dealt with; is assuming a power over a subject-matter which the states themselves can abolish or create.

To avoid the force of this inference, a distinction has been taken in regard to the importation of slaves into the slaveholding and non-slaveholding states. But where is this distinction found? Certainly not in the letter of the Constitution; certainly not in its spirit. It is admitted, that the importation of a slave into New York, where the sale as a slave, and his detention in slavery are forbidden, may be prohibited; yet it is urged, that the importation of a slave into Mississippi, where his sale, when so brought, is forbidden, cannot be prohibited. The distinction is not to be sustained. Commerce is the traffic in articles which are the subjects of traffic, either in the place from which they are brought, or the place to which they are taken. If the place from which they are brought is the test, then is every slave, taken from Virginia to New York, an article of commerce, and any regulation by the latter in regard to him, is a violation of the Constitution. If the place into which they are imported, determines their character, then is the privilege of the slave state, in regard to their disposition as matters of commerce, as strictly constitutional and complete as that of the free states.

On the principles, then, laid down, in the case of Gibbons *v.* Ogden, this is clearly a matter of commerce, depending on the state laws, affecting the state laws, and not necessary for any of the purposes of the general government.

But it is said that, being an importation of an article, it necessarily presumes intercourse, which is commerce. To that it is

answered, that mere intercourse, even between different states, is not commerce; it must be intercourse connected with, or auxiliary to trade. Such is the evident meaning of the Court, in the case of Brown *v.* The State of Maryland. But here this necessary ingredient is prohibited; the article cannot be sold. There is, therefore, no object upon which commercial regulation can act.

In the only remaining case where this constitutional clause was discussed, New York *v.* Milne, 11 Peters, 135, is there a word found which sustains the idea that this power authorized Congress to interfere with the traffic in slaves among the states, or the regulation in regard to it? The reverse. That case most ably examines the decisions of Gibbons *v.* Ogden, and Brown *v.* The State of Maryland. It shows that the former extended only to the regulation of navigation, under an act of Congress, as a branch of commerce; the latter involved the right of the state to interfere, by a tax, with the taxing power of Congress. But farther than this, it (11 Peters, 136) sustains the very position now submitted; that the regulation of commerce is intended to apply to " goods," to the articles that are strictly merchandise.

Take, then, the construction given by this Court to this clause, and it is evident that Congress cannot make commercial regulations about any thing that is not in itself commercial property, and so recognised by the state.

Now the state of Mississippi does not recognise these as property subject to sale—subject to commerce when thus imported. It seems it does not recognise them as such property at all; they are at the disposition of the legislature, under the act of 1822; but at all events they are not property liable to commercial traffic, when so introduced. In the case of the state of Mississippi *v.* Jones, Walker, 83, the law of that state was established clearly that they were the creatures only of positive law, not property by any other right.

II. But suppose that slaves are to be so regarded, still, as a regulation in regard to property brought into the state, these prohibitory enactments are authorized.

This Court, in the cases of Gibbons *v.* Ogden, and Brown *v.* The State of Maryland, had laid down the rule that a state might do whatever was necessary to protect itself internally: its qua-

rantine, police, pilot laws, &c., all relating to and connected with navigation and commerce. But in the case of New York *v.* Milne, 11 Peters, 139, this principle was more broadly and fully enunciated. After declaring that the authority of a state is "complete, unqualified and conclusive," in relation to those powers which refer to merely municipal legislation, the Court observe that "every law comes within this description which concerns the welfare of the whole people of a state, or any individual within it; whether it relates to their rights or their duties; whether it respects them as men or as citizens of the state." This view clearly embraces the present case. The evils against which the people of Mississippi desired to protect themselves, have been fully pointed out. Their determination to stop the introduction of slaves without corresponding emigration; to guard against the admission of the vicious through the deceptions of negro traders, were evidently objects of proper municipal regulation, equally concerning the welfare of the whole people of the state, and that of many an individual within it.

III. But suppose this to be a commercial regulation; not of the class above referred to, but one which Congress might make; still is the power of Congress exclusive or concurrent? It is not meant to contest the general principle assumed by the counsel of the defendant, that, in matters clearly within the scope of those powers and duties pertaining to the general government, it is exclusive; but is this such a case? In matters which are legitimate objects of legislation by the states, they may exercise a power as well as the general government. Each may levy taxes; each may regulate passengers coming in foreign vessels; each may improve navigable streams. Are not the powers now claimed by the state of Mississippi of this class? Even if we admit Congress might regulate them, could not that state also do so? And if not, to what serious evils might it lead! Congress has never yet acted on the subject; yet who can deny that it is a subject that must have been acted on? It is submitted, therefore, on all these grounds, that this is not a regulation of "commerce among the states," according to the meaning of the Constitution; but if it is, it is one that the states themselves have also a right to make.

Nor should we forget that this is the settled construction given from the earliest days of the government by Congress; by the

states; and by the Courts of the United States and the states. Congress, when it admitted the states of Alabama, Illinois, Missouri, Arkansas, as well as Mississippi, approved of constitutions having similar provisions in them. In nearly every 'state of the Union, laws of the same character have been enacted without hesitation, even from the days of the revolution. They exist in the free states, as well as the slave states, for the principle is the same. If the right to forbid importation for sale does not exist, how can it be exercised in a free state more than in a slave state? The decisions of Courts of the' United States and of numerous states of the Union, recognising the validity of laws which depend on this principle, have been already referred to so fully that it is unnecessary to dwell further upon them. Now, it is respectfully asked, can this Court undertake for the first time to give a construction to the Constitution which will set at naught these constitutional provisions of the states, these laws, and this uninterrupted series of judgments of judicial tribunals? Yet it is in vain to disguise it, that this must be the effect of a decision in favour of the defendant on this point of the case. It would indeed be, as was said, to sacrifice a hecatomb of laws. And for what purpose—what good? Have not these regulations been safe, just, and prudent? Are they not conformed to the feelings, opinions, and laws of the several states, whether permitting or prohibiting slavery? Would these be better suited by what Congress would do? On the contrary, would not an attempt on the part of Congress, now for the first time after a lapse of fifty years, exclusively to do that which the states have always done themselves, strike a blow at the laws and institutions of the states? Would the free states readily submit? or would slave states? If such fate is reserved for the constitutions, laws, and judicial decisions of the states; if they are all to be broken down, and a new power of regulation awaits them; who can tell what may be its effect on the institutions and power of the Union itself?

On all these grounds, therefore, it is submitted that this prohibitory clause in' the constitution of Mississippi is not only clearly expressed, but it is in itself a legal and constitutional provision.

The next question is: was the conduct of the plaintiff below intentionally at variance with this provision of the fundamental

law? That it was, is evident when we take the whole transaction together. The sale of the imported negroes formed necessarily a part of the transaction, without which the violation of the law was not complete. It will be seen that the introduction of slaves into Mississippi, from other states, is not forbidden. They may be brought there by persons coming to the state for a limited period, or intending to remain there permanently. It is only when brought there to be sold that the constitution is violated. The evidence of this object—the only violation of the law—is the sale, or the offer to sell. Until that moment the crime is res infecta, an un-accomplished act: when the slave becomes the subject of a bargain, then it is that the introduction as merchandise is apparent, and the violation of the law complete. Whether there might not be an act indicating the intention and purpose for which the slaves were introduced, other than the contract for their sale, it is not necessary to discuss; when the sale follows it forms part of the illegal transaction; characterizes the introduction; shows its improper character; and so taints the whole bargain that, to consummate it through the agency of a Court, would, in the language of Chief Justice Wilmot, "pollute the pure fountain of justice."

Here, then, is a solemn provision of the constitution of Mississippi, and a transaction of the defendant in error yet unfinished, which is in direct violation of it. He now seeks to compel the completion of this transaction; to accomplish the business, for his own benefit, and in the face of the law of Mississippi, at the expense of third persons, and through the agency of this Court. Can he do so? That he cannot, is a principle established by the laws of every civilized country. By the Roman law (1 Pothier on Ob. 25. Story's Con. of Laws, 204) it was well settled that where the foundation of a contract or a promise was an act repugnant to justice, good faith, or morals, the promise could not be enforced in a Court of justice. By the common law, as settled by repeated decisions of English Courts, wherever a transaction contravenes the general policy or the express stipulations of the law, no form of expression is permitted to veil its inherent impropriety; the real object of each party to the contract will be examined, and if either is found to be aiming at that which is repugnant to principles established for the general be-

[Groves et al. *v.* Slaughter.]

nefit of society, the Courts of justice will repudiate it, however artfully the arrangements have been made to accomplish the desired end. Where both have been equally guilty, the Courts have with equal pertinacity refused to interfere, though that refusal has indirectly benefited one of the guilty parties. Casuists in the law of nature and of conscience, have speculated on the obligations which bind those who profit by such contracts to fulfil them; but the common law, with a clearer and more honest perception, has repudiated all such speculations, and has refused totally and peremptorily to interfere.

It would be easy to trace this principle through a number of adjudged cases, illustrated by every variety of facts, but this is needless. It will be sufficient to advert to a few of unquestioned authority, which exhibit it under circumstances analogous to the present case.

It is an established rule, to which no exception has been produced, that prohibited goods cannot form the consideration of a valid contract; a principle laid down by Huberus; recognised by Lord Mansfield, and never denied by one single authority. Story's Con. of Laws, 209. That was the principle in Law *v.* Hodgson, 2 Campbell, 147, in regard to the bricks; there the making of such articles was forbidden; and every contract in relation to them was void. That was the principle in Billard *v.* Hagan, 2 Carr. and Payne, 472, where the importation of the silks was prohibited; and it was exactly a similar case to the present, for it was a suit against the acceptors of a draft given in payment of the articles after their importation.

The next principle, which also is indisputable, is, that wherever the object of a prohibition is to protect the public, and not one for purposes of revenue, or some regulation connected with the execution of municipal laws, there can be no recovery by a person who has committed an act at variance with the prohibition, whether the act be the particular thing forbidden or not. In the case of Steers *v.* Leshley, 6 Durn. and East, 61, the sale of stocks was prohibited, as against public policy, and the Court refused to allow a person to recover, who had advanced money to pay a difference; not actually to buy the stock. So in Langton *v.* Hughes, 1 Mau. and Sel. 563, the adulterating of beer was prohibited, and the sale of articles to a person engaged in adulterating it,

was not deemed a ground for recovery. So in the case of Fales *v.* Mayberry, 2 Gal. 560, the employment of vessels in the slave trade was prohibited; and the purchase money of a vessel sold in a foreign country, after her employment ceased, could not be recovered. There has been no authority produced to contradict this principle; yet, it is completely applicable to our case.

The principle contended for by the defendant, is, that in the present case, the contract is merely collateral, and not a part of the illegal transaction. This is not so. It is clearly the only real part of the transaction; and the subtle train of reasoning, by which it is attempted to show that it is not, is neither accordant to the morals or the judgment. But admit it to be correct; it yet applies only in cases where the principles above asserted do not exist. It does not apply to cases where there is a positive prohibition to import an article, or to do a certain act. In one case already cited, 1 M'Clellan and Young, 122, neither party knew of the prohibition, yet the sale was held to be void.

These are the cases at common law. Let us look to our own decisions.

This Court has examined the same principle in several cases. That of Hannay *v.* Eave, 3 Cranch, 242, was one where a resolution of Congress had declared that an enemy's vessel, captured by her own crew, should be a lawful prize to the captors. Eave, the captain of a British vessel, during the war, found himself in a sinking condition, and agreed with the crew, that they should put into a port of the United States, and libel the vessel as captors, and that he would hold a certain portion of the proceeds, in trust for the owners. The vessel was condemned and sold; and the owners sued the captain under this contract. This Court denied their right to recover, because the contract was against the resolution of Congress. In the case of Patton *v.* Nicholson, 3 Wheaton, 204, Patton became possessed (without any intercourse with the enemy) of a British license, in time of war. This he sold to Nicholson, (who had not assisted in procuring it,) and took his note in payment. A suit was brought to recover the amount. This Court refused to interfere, to sustain the suit, on the ground, that the procuring of such a license being unlawful, the sale of it was equally so. In the case of Armstrong *v.*

Toler, 11 Wheaton, 258, the law upon this subject was very fully examined. That was a case where goods were imported into the United States, contrary to law, and consigned to Toler. They were libelled, and, before trial, delivered to Armstrong; Toler, the consignee, giving security for the whole, on agreement of Armstrong to repay him, if they were condemned. They were, and the amount secured was paid by Toler, who sued Armstrong to recover this amount. This Court sustained his right to recover, on the ground that the agreement was unconnected with the illegal act; and was a new contract; founded entirely on a new consideration, and not affected by the illegal proceeding; but that it would have been otherwise, if Toler had been himself interested in the goods illegally imported, or had been concerned in the scheme. They added "that where the contract grows immediately out of, and is connected with an illegal or immoral act, a Court of Justice will not lend its aid to enforce it. And if the contract be, in fact, only connected with the illegal transaction, and growing immediately out of it, though it be in fact a new contract, it is equally tainted by it." In the case of Gaither v. The Farmers' Bank of Georgetown, 1 Peters, 37, the bank made a usurious contract with Corcoran, who endorsed over to them, as collateral security, a note from Gaither to him, who had nothing whatever to do with the transaction between Corcoran and the bank. On this note, the bank brought suit as endorsees, but this Court refused to sustain their right to recover, on the ground that it was tainted and destroyed, by its connection with the usurious and illegal transaction. In the case of Bartle v. Coleman, 4 Peters, 184, Bartle, a contractor for rebuilding a fort, made a corrupt agreement with Marsteller, the public agent, charged with the superintendence of the work, and Coleman, to divide the profits; Marsteller was to make the certificates, and Coleman to receive the money from government and disburse it. The fraudulent character of the affair was discovered, and the contract dissolved. Marsteller died. A suit was brought by Bartle, to obtain a settlement of accounts between him and Coleman. This Court refused to interfere, and declared that where a loss was the result of a violation of the laws, the parties must be left to settle the matter between themselves. In the case of Craig v. The state of Missouri, 4 Peters, 436, Craig purchased of the state certain

loan office certificates, emitted by the state, under a general state law, but which were, in fact, bills of credit. For this purchase, he gave a note to the state, and this suit was brought to re-over the amount. This Court refused to sustain the demand, because the issue of the certificates was a violation of the Constitution. It will thus be seen, that, by a uniform series of accordant decisions, the Common Law Courts of England, of the states, and of the Union, have irrevocably fixed the great rule, in regard to a remedy for violated contracts; that no plaintiff will receive the aid of the Court, in prosecuting his claim, where it is founded on a violation of the law, or an act contrary to public policy. This rule asserted, more than a century ago, in the comprehensive language of Holt, when he said that "every contract made for or about any thing that is prohibited by a statute, is void," receives in our own day its final stamp, from one of as clear honesty, and of broader genius, when he affirmed, and maintained it, though the plaintiff and the contractor was a sovereign state.

In no case cited or known, has this rule been infringed; never has the plaintiff been permitted to profit immediately or remotely by the consequences of his violation of the law. In some of the instances adverted to, nice distinctions have been drawn, to prevent a defendant, who was himself a participator, from escaping from his share of the loss; but even then, the plaintiff has been required to satisfy the Court, that the actual matter of contract was but remotely or indirectly connected with the illegal transaction, and that, if acquainted with, he was yet free from participation in it.

In the present case, the rule applies with full force, and is met by all the facts which are necessary to its complete recognition. The party who seeks the benefit of this violation of the constitution of Mississippi, is he who violated it; the contract, if fulfilled, gives him a reward, in an immense sum of money, for the successful accomplishment of that violation; it is done at the expense of those who were innocently made, to some extent, parties, if not to the offence, yet to the transaction incident to it; the contract, the bargain, the sale, is part of the illegal act, since, without that, there was but an imperfect violation of the law, confined to the breast and intention of the plaintiff; it is, in no sense, a new

or separate proceeding; it is like the purchase of the bills of credit, after they had been created by a law of Missouri; like the sale of the silk goods, after they had been smuggled; like the agreement to divide the proceeds of the capture with those who were not entitled to it; like the bargain for the bricks made contrary to the provisions of the statute.

If any doubt could remain, whether or not the illegal act, the violation of the constitution of Mississippi, was, in fact, the consideration of this contract—this promise on the part of the maker of the note, that doubt would be removed, by applying to it the test of Lord Mansfield, and reversing the application and the parties to the contract. If it be not a violation of the prohibition, to enforce the payment of the sum for which these slaves were sold, it would be lawful to have enforced their delivery to the purchaser, had the importer stopped short in his course of illegal proceeding, and refused to consummate it by completing the sale. Who will assert this? Who will suggest, that any Court would lend its power for such a purpose? Yet if each side of the contract has, as it must have, equal weight, we must admit the propriety of enforcing the delivery of the slaves, or we must refuse to aid in compelling the payment of the sum for which they were sold.

But suppose that the actual violation of the law ended with the introduction of the slaves, and that the act of selling them did not fall within the letter of its prohibition. Is it necessary that the improper act should be a direct and literal violation of a statutory provision? Certainly not. It was not so in any of the cases cited. It was not so in that of Bartle v. Coleman, decided by this Court. It is not held to be so in the annunciation of the principle anywhere. If the act be "against the policy of justice," it vitiates the bargain as fully as if it is contrary to the letter of the law. In Jones v. Random, 1 Cowper, 39, it was admitted that the contract was against no law, but against morality and sound principles, and it was held to give no ground for recovery. In Leerot v. Riley, 3 Durn. & East, 24, where there was no violation of the bankrupt law, but an act infringing its spirit, the same rule was laid down. In Hunt v. Knickerbacker, 5 John. 333, it was held, that when any contract will lead to a violation of law, in its execution, it is void; and, in

Sydenberg *v.* Charles, 4 Serg. & Rawle, 173, the Court said, no form of contract could prevent an examination of its real nature.

To argue that to sell slaves, known to be introduced in direct violation of the constitution of a state, and especially to permit that sale to be made by the person so introducing them, is " against the policy" of that constitution, seems to be a work of supererogation. What can better indicate the general policy of a state, in regard to such an act, than the positive prohibition of the previous step necessary for its accomplishment ? What could show the policy of the Constitution of the United States, in regard to selling bills of credit by a state, more clearly than the prohibition to issue them ? Would this Court, then—even if the sale of these slaves were not prohibited—would it interpose to protect an act, to secure a profit from an act which is indisputably at variance with the settled and avowed policy of the state, and known to be so by the plaintiff below, when he made his bargain ?

In conclusion, then, it is submitted, that the judgment of the Court below was wrong ; because the transaction, which formed the consideration of the note sued on, was contrary to the letter of the constitution of Mississippi, and contrary to the policy of its constitutional and legal provisions ; and because, in such a case, Courts of justice will not interfere to enforce the contract, for one party or the other.

Mr. Jones, for the defendant in error.

This case is of much importance in principle, and it is also so, because of the very large amount of property which depends for its safety on the decision of this Court. Millions of dollars have been laid out in the purchase of slaves, carried into the state of Mississippi, from other states, for sale ; without an idea on the part of the sellers or the buyers, that there was any law or constitutional provision which affected the transactions.

When the obligations, given for these purchases in good faith, became due, after the elapse of long credits, a latent objection was found to the contract. The purchasers set up a provision in the constitution of Mississippi, which they said prohibited the dealing into which they had entered ; that the obligations given by them were therefore void : and they hold, and will hold, the slaves they purchased without making payment for them.

The magnitude and importance of the case are stated by the

counsel for the plaintiffs in error. The dangers of interference with the prohibitions of the constitution of a state of the confederacy of opposing the decisions of the Courts of the state, giving a construction to the constitution, which will be produced by this Court sustaining the judgment of the Court below, are represented in strong and eloquent terms. All this is to arise from the legitimate action of the Court, which has the case properly before it; and which will decide it according to their judgment, without regard to consequences.

Two cases are before the Court; and the counsel engaged for the defendant in error have agreed to divide the points in the cause between them. No discussion of the constitutional question, the right of Congress to regulate the trade in slaves between the states, is now proposed. This question will be left to the able counsel, also representing the defendant—" The Ajax and the Achilles of the bar"—will sustain the true interpretation of this provision in the Constitution of the United States.

The case presents two heads for inquiry.

1. Whether there was, at the time of the contract an efficient prohibition against the introduction of slaves, as merchandise, into the state of Mississippi; and which can overturn a practice, universally prevailing in the state, and which had the confidence of every one, and the doubt of no one as to its legality?

2. Whether, if the constitution of Mississippi did prohibit the introduction of slaves, as merchandise, after the period named in it, the construction of the provision is to be carried so far as to abrogate contracts for the purchase of that description of property, made after the slaves had been introduced into the state?

The clause in the constitution is very short; and it is to be decided whether it is to be considered as an enacting provision, or one enjoining legislation on the part of the legislative body; whether it is a fundamental law, or one only organic.

The practice, under the Constitution of the United States, and under the constitutions of the states, has been to leave to the legislature to enact laws to carry the principles adopted in the constitution into operation. To assume that a constitution is to be construed to carry into action the provisions it contains, without the aid of special enactments by the legislative body, is out of the usual examples. At the time of the Revolution a different prac-

tice prevailed; for then an old and established government was to be set aside, and new and extensive provisions were necessarily to be made, which would go into immediate operation.

The assumption in this case is, that the constitution of Mississippi took on itself the exclusive right of providing for the subject, and made a perfect and complete system, which was not to be altered. It will be shown, in the course of the argument, how imperfect and inadequate the provision was for the attainment of its design.

Look at the provision, and inquire if it is an enactment to carry out the object it had in view. No penalty is fixed for the violation of its injunction. No forfeiture is imposed by it. It stands a naked provision, an unsupported and unaided prohibition. We find no such form of provision in the English system of laws. No prohibition is found among those laws without forfeitures and penalties to secure their being executed, if they are to operate immediately.

It is said by the counsel for the plaintiffs in error, that this is not a command to the legislature to make laws which will carry the prohibition into effect. If this is admitted, the question is settled. The provision in the constitution is, proprio vigore, in operation; and it is to be aided by its own weakness.

What are the means of enforcing the provision in the constitution, without legal enactments to carry it into effect? An indictment at common law, and the party bringing the slaves as merchandise, to be punished by fine or imprisonment. To state these modes of executing the constitutional provision, is to show its inefficiency. It is said the prohibition in the constitution was made independent of legislative aid, from a distrust of the legislature; and yet the whole execution of the constitutional declaration is to be left to the independent discretion of the Courts. This will not be admitted, unless there shall be shown in the constitution a positive inhibition of legislative action.

The first constitution of Mississippi contained restrictions on the introduction of slaves. It prohibited the bringing in of slaves who were convicts; and there was legislation on the subject. The circumstance that the provision was imperfect, is evidence that it was intended by the new constitution that the legislature should make complete regulations on the whole subject. If any

other view of the matter is admitted to be correct, nothing remained to be done by the legislature; and the object of the framers of the constitution would, in a very great measure, be defeated from the entire inadequacy of the provision.

The act of the legislature of Mississippi of 1837, shows that the view taken by the counsel for the defendant in error upon this subject is correct. Under the constitution the legislature were to act, and this was considered as enjoined on them. They did so, and imposed heavy penalties on the introduction of slaves for sale. This is evidence of the opinion of the legislature that they were to carry out the provision of the constitution; and that without their aid it could have no operation.

The defendant in error sustains the constitution of Mississippi. He seeks to give it efficiency, and not to set up an absolute pageant, without a capacity to carry the object of its provisions into effect.

The present constitution of Mississippi alters the situation of the legislature from that in which it stood under the provisions of the former constitution. Before, the legislature had a discretion to prohibit the introduction of slaves; now, a mandate to them is given, and laws must be passed containing prohibitions, and imposing all the penalties and forfeitures which may be necessary to carry the purpose into full effect.

Upon all the principles of legal construction and propriety, the construction of the provision in the constitution looks to future acts of the legislature, and not to immediate effect. It shows that legislative provisions were anticipated. The purpose was to impose and enjoin on the legislature that laws should be passed which would prevent the introduction of slaves as merchandise or for sale. The policy of the state was thus solemnly settled; and can it be supposed that the carrying out that policy would have been left in the imperfect situation as to its enforcement, in which the adoption of the constitutional prohibition placed it.

Let us inquire whether the provision in the constitution has been construed in Mississippi by the legislature, and by the Courts of the state, so as to enjoin on this Court the affirmance of the construction?

It might be assumed, that at the time the slaves were sold for which the notes were given, there had been a general construc-

tion of the constitution, in accordance with that which is now claimed by the defendant in error. This was the condition of public opinion from 1833 to 1837, when the legislature acted, and carried the provision into effect.

The act of 1837, shows that in the opinion of the legislature a law was required to carry the constitution into force. The intermediate period, from 1833 to 1837, was employed in efforts to obtain a repeal of the constitutional enactment, and to restore the provision in the first constitution. It was not ascertained whether these efforts had been successful until 1837. A vote had been taken by the people of the state on the proposition to restore the first provision; and the effect of the vote had been misunderstood, and continued so for some time.

During all the intervening time, the importation of slaves as merchandise, or for sale, went on without interruption. The Court will look with respect to the opinion thus manifested by the people and authorities of the state, if a doubt as to the construction existed. The legislature acted on this construction. The slaves thus introduced were made the special subject of taxation, by legislative enactment.

The decisions of the Courts of the state of Mississippi have been contradictory, and the construction by those Courts of the constitutional provisions, on the subject of the introduction of slaves, has not been conclusively settled. The cases cited by the counsel for the plaintiffs in error, when examined by the Court, will be found to sustain these positions.

It is the established principle of this Court that when there have been a series of decisions of the Courts of a state on its local law, those decisions will be regarded and respected. But the decisions must be those of the highest Courts of the state; and, without exception, giving the same construction of the constitution and laws of the state. Such have not been the decisions cited in this case.

On the second point of inquiry, whether the provision in the constitution of Mississippi was to be considered as operating and in full force six months after it was adopted, so as to make invalid contracts for the purchase of slaves after their introduction; Mr. Jones said, no question is more involved in difficulties than that which arises upon the effect of prohibitory statutes to avoid

[Groves et al. *v.* Slaughter.]

contracts made in opposition to them. There has been a great diversity of opinion among judges on this question.

Whether the property introduced against the constitutional prohibition was such as that a contract for its sale could not be made, seems to depend on the character of the property in Mississippi, after its introduction. The slaves so introduced did not become free. They could not be so by the laws and constitution of Mississippi. They did not belong to the state : no such regulation had been made. They were made the subjects of taxation. Could they not be sold, and the penalties attach to the importers; leaving the slaves the subjects of sale? Nothing is seen in the laws or constitution of Mississippi to prevent this. Buying and selling the slaves, when they are in this situation, seems to be a right not to be denied. The authorities cited to sustain the position that the contract is void because of the prohibition of the introduction of the slaves, are all cases in which the forfeiture of the property was a necessary attendant of a violation of the law. They make the forfeiture a part of the penalty. But, as has been remarked, the constitution of Mississippi did not make any such provision ; all the cases turn on the construction to be given to the provisions of the statutes, on the violation of which they have arisen. No general rule can be deduced from them. The policy which may have induced the statutes may require the forfeiture of the property, and thus take from its previous owner the right or power to sell it. The final cause of the law could only be obtained by the prevention of the use of the property, and, therefore, of its sale. But it was not the policy of Mississippi to prevent the introduction of slaves as property, but only to limit their being brought into the state by those who resided, or proposed to reside in the state. Cases cited in this part of the argument, 11 East, 108. 5 Taunton, 181. 1 Massachusetts Reports, 5. 1 Maule and Selwyn, 593. 4 Term Rep. 416. 5 Term Rep. 599. 3 Barn. and Alderson, 221. 4 Esp. Rep. 183. Strange, 1247. 2 Burrows' Rep. 1077. 3 Term Rep. 419. Toller *v.* Armstrong, 11 Wheaton. 1 Mass. Rep. 138. James *v.* Dumont, 5 Johns. 327. 4 Dall. 279.

Mr. Clay, for the defendant in error, said, the questions to be decided in this case, involved more than three millions of dollars,

due by citizens of the state of Mississippi, to citizens of Virginia, Maryland, Kentucky, and other slave states. The magnitude of the cause is shown by the increase of slaves in the state of Mississippi, from 1830 to 1840. In 1830, the slave population was about sixty-five thousand. In 1840, it had increased to upwards of one hundred and ninety-five thousand. The greater portion of this increase took place about the time the contracts on which these suits were brought were made. Within the period of seven years, from 1830 to 1837, the increase had been more than seventy-four thousand. A large portion of this number had been introduced into the state as merchandise or for sale, by non-residents.

The universal habit of all the planting states, has been to buy slaves on credit, leaving the product of planting to pay for them. Tens of thousands of slaves have been introduced, and contracts made by citizens of Mississippi to pay for them on time; and now the question is, whether these contracts shall be extinguished, by an ex post facto construction of the constitution of the state?

What is the case, briefly? In 1832, the constitution of Mississippi was altered, and a provision was made in it, declaring that the introduction of slaves as merchandise, or for sale, should be prohibited after May, 1833. No legislation took place to carry out the prohibition. From 1832 until 1837, no one questioned the right to introduce slaves for sale; all concurred in opinion, that the constitution did not, proprio vigore, prohibit their introduction. The defendants in error, acting in conformity with this universal understanding of the constitution, introduced slaves for sale; paid the tax laid upon them by an act of the legislature of the state, after the alteration of the constitution; and the purchase of them was made by the drawer of the notes, under a full belief, that the contract was valid and obligatory on the parties who entered into it.

The slaves thus purchased are now held in hereditary bondage, and those who purchased them are in the full enjoyment of the property: no offer has been made by them to deliver them back to the defendant in error; on the contrary, this has been positively refused. In this state of the case, this Court is

[Groves et al. *v.* Slaughter.]

called upon to ratify a violation of the contract, and to allow its violators to hold the property.

What are the grounds on which this claim is founded?

1. According to the interpretation of the provision in the constitution of Mississippi, the plaintiffs in error say the words "shall be prohibited after the 1st of May, 1833," are addressed to the people of Mississippi; and being so, all slaves introduced after that time cannot form the consideration of a legal and binding contract.

Is this a binding and operating prohibition, without calling on the legislature to carry it into effect?

It will be shown, from the constitution of Mississippi, and from the practical construction given to that constitution, by cotemporaneous expositions of the provision in the constitution, that an absolute prohibition of the introduction of slaves, to go into effect after May 1, 1833, was not intended. The same construction of provisions of a similar character, has been given to the Constitution of the United States, and to those of the individual states. A simple perusal of the constitution, will show and satisfy all that its object was to direct what was to be done, and not to do it. The nature of constitutions is to establish and declare principles; and, except in some particular cases, to leave to the legislature the enactment of laws, to carry out the principles thus declared.

The Constitution of the United States uses the terms, "shall be," in the sense claimed by the defendant in error. So does the constitution of Mississippi. "Slaves" are a separate head in this instrument, and the constitution addresses itself to the legislature. The Court will find many passages in that constitution which support this position. In some parts of the constitution, a discretion on the subject of slaves is given to the legislature; but as to the introduction of slaves as merchandise, after May 1, 1833, a duty is imposed; and the legislature are commanded to enact prohibitions, and effectually to accomplish the object.

If the convention had intended this as legislation, would they not have affixed sanctions to the violation of it? Can it be supposed that the legislature intended to give it this operation, and to leave it naked, and unsupported by forfeitures and penalties?

Compare the constitution of Mississippi, with that of Ken-

tucky. They are nearly the same. That of Mississippi is copied from the constitution of Kentucky. No decision can be found that similar provisions of a constitution operate without the action of the legislature.

So in reference to the provisions in treaties, a similar construction has been given. " Shall be" has been interpreted to enjoin legislation: and this was the view of the Supreme Court, in the case of Foster and Elam *v.* Neilson, when the Spanish treaty was first under its consideration. Afterwards, when it was found that the Spanish words of the treaty had a present effect, different views of the subject were adopted; but this did not alter the decision of the Court interpreting the English words of the instrument, as prospective, and requiring legislative aid.

Mr. Clay then went into an examination of the proceedings of the legislature of Mississippi, after 1832, on the subject of an alteration of this provision of the constitution. The proposition for an alteration, which would have given the legislature powers to postpone the operation of the interdict, was submitted to a vote of the people of the state. It was afterwards discovered that a sufficient number of votes in its favour had not been obtained. In the mean time, nothing was done to carry the provision into effect by law. In 1836, the legislature was called upon by the Governor to pass a law, which was not done. A law was passed in 1837.

In 1837 the Governor proposed again to the legislature to pass a law, prohibiting by penalties and other sanctions, the introduction of slaves as merchandise; or in other terms to execute the provision in the constitution as the declared and fixed policy of the state. The legislature finding that the alteration which had been proposed could not be made, and to prevent the drawing out of the state large sums of money for the purchase of slaves, enacted the law which is now in force. Before the law was passed, between May 1, 1833, and 1837, the introduction of slaves as merchandise had the implied ratification of the legislature. A tax was specially imposed on slaves so introduced.

This is plain and unquestionable proof of the opinion of the legislature on this provision of the constitution. The act declares that the introduction of slaves as merchandise shall be " hereby

prohibited," and imposes sanctions for the violation of this statute. Fines are to be imposed, and the imprisonment of importers is directed.

If, now, another construction is to be given to the constitution, the conduct of Mississippi has been to lay snares for the citizens of Virginia, Maryland, and of other states.

Upon what construction of the constitution is the Court called on to act? Not on their own. Upon the decisions of the Courts of the state, where this outrage on justice is sought to be perpetrated. Is this Court a Mississippi Court, or a Court of the twenty-six states? Is this Court to decide for itself, or to take the decision of Judge Trotter of Mississippi for their rule of decision? This is a Court of the Union—of the whole Union—of the confederacy of the states of the United States; and it is bound to construe the constitution of the state of Mississippi, not by the construction given in times of passion, not on decisions given which may have been biassed, by the large interests of the state, supposed to be benefited by the decisions of the State Court, but on great principles, and on those of justice and truth.

It may be admitted that this Court is bound by a series of decisions of Courts of a state, settling the construction of the constitution and laws of the state. This principle has been declared frequently by this Court. But a single decision of a State Court, and contradictory opinions of the judges of the Court, will have no such weight or influence.

Who are the judges of the Courts of Mississippi, and what is the tenure of their offices? They are elected by the people; and the judges so elected form the Court of Errors: and a Court thus constituted are called upon to decide a case affecting a large portion of the citizens of the state, in which strangers to the state, and who have no influence in their appointment, are the claimants! The judges of Mississippi are sitting in their own cause; in the cause of those around them; of those who gave and can take away their offices!

The object of the Constitution of the United States, in establishing the Courts of the United States, and giving to those Courts the decision of cases in which citizens of other states than those in which a controversy arises, was to have such controver-

2 s 2

[Groves et al. *v.* Slaughter.]

sies decided impartially, and without the influence of local bias, or that of local Courts.

"I hope," said Mr. Clay, "never to live in a state where the judges are elected, and where the period for which they hold their offices is limited, so that elections are constantly recurring." The eighteenth number of the Federalist shows the purposes for which the tribunals of the United States were established. It was intended to provide for the very case now before the Court; for cases arising under a peculiar state of circumstances. By the Courts of the United States deciding independently upon true principles, and according to the just interpretation of the constitution and laws of the states, the harmony and union of the states would be preserved. The occupying claimant law of Kentucky presented a case, on which the principles now contended for were applied by this Court. The law had been in force for twenty years. It had received the repeated sanctions of the Courts of the state of Kentucky. But this Court set aside that law as between citizens of other states.

Mr. Clay went into a particular examination of the cases cited by the counsel for the plaintiffs in error: and he contended that the question of the construction of the proviso in the constitution of Mississippi was not, by those cases, shown to have been established. The judges of the Courts had not agreed in opinion. Some of the cases had been decided by the inferior Courts; and some of the cases had been brought before the Courts of Mississippi, while the whole of the people of the state were involved in great pecuniary embarrassments. He repeated his reliance on the positions, that such decisions should not govern the Supreme Court of the United States. While he positively and explicitly asserted these views, he had no wish or intention to cast a shade on the integrity of the judges of the Courts of Mississippi. The security of the slave states rests on the security and preservation of the Union. Isolated, what would be the situation of Mississippi. A sketch of the frightful future will be avoided. Thousands, millions would now rush to the rescue of that state from a servile war. The genius of Fulton has given the means of protection to the slave states: and in steamboats, on the beautiful rivers of Ohio and Mississippi, the people of the Union, "armed

in proof,'' would hasten to the preservation of their brethren of Mississippi; and of every state exposed to intestine commotion.

Mississippi has not abandoned the introduction of slaves. The citizens of that state may go into other states and buy slaves. The only change which has been made is, that instead of the slave trade by strangers, the planter buys the slaves he requires, and carries them into the state for his own use. After they have been thus introduced, after they are thus in the state, no objection to their sale can be sustained. The number of slaves in the state may be increased by these means, indefinitely. The right thus to introduce slaves is recognised by the act of assembly of 1837.

Is a contract made with a concurrent opinion of its legality; as was the case between the defendant in error and the plaintiffs here; where the property acquired by such a contract is retained, and the same property sold has, before sale, been taxed by an act of the legislature, recognising its introduction into the state for the purposes of sale; to be set aside? This appears to be an outrage on the principles of common justice.

It is admitted that when contracts are immoral, they are void. This is a general principle of all laws. The laws of heaven enjoin the avoidance of such contracts. All are bound to avoid malum prohibitum; but the law must be known from the authorities of the state. If, by a new construction of the law, persons are involved in penalties not before known, not before claimed, the law is ex post facto. It is a violation of right. This ground is taken, supposing the construction set up to be a just one; yet if the course has been different, if the authorities of the state have acted on different principles, the proceeding is ex post facto; the law, thus applied, is ex post facto.

What is prohibited by the constitution of Mississippi?

In considering this question, it is necessary to look at the situation of the slaves in Mississippi, carried into the state after May, 1833, for sale as merchandise. Are they free? If they were free, it would be some consolation. But there is no freedom for such persons in Mississippi: and those who purchased them, and seek now to escape from paying for them, continue to hold them; and against moral rectitude insist on their ownership, acquired by a

violation of the constitution of Mississippi. It would be gratifying to those who love freedom, if the negroes were free. And who does not love freedom?

They remain slaves by the constitution of Mississippi. By that constitution there can be no emancipation but that which is provided by law. A reference to the laws of Mississippi, and to the decisions on them, will fully sustain this position. Laws of Miss. 166. 154.

The offence of introducing slaves, as merchandise, or for sale, may be considered as complete, under the prohibition of the constitution, if the construction given by the plaintiff in error is correct, as soon as the introduction took place. If the slaves continued to be property, and were not made free by their illegal introduction, contracts for their sale and purchase could be made. This is an incident to property. It is, necessarily, a right which the owner of the property has to sell it; to bequeath it. The slaves would have been liable for the debts of the defendant in error, while in his hands unsold.

It is a well established principle, that if no forfeiture of property for an offence committed by its owner, has been declared by the legislature, the judiciary cannot impose a forfeiture. Cooper *v.* Telfair, 4 Dallas, 16. The judiciary cannot make laws. When the statues declare forfeitures, no sales of the prohibited articles are valid. Silks, by the express terms of an act of the Parliament of England, might be seized "while rustling on the fair form of beauty, in the maizes of the dance." 2 Carrington and Paine, 472. The case of Toler *v.* Armstrong, 11 Wheat. 258, establishes the principle that a contract may be enforced which grew out of an illegal transaction, but which was no part of it. There money paid for duties on goods, illegally brought into the United States, was recovered from the owner of the goods.

The last question in the case is, whether the provision of the Constitution of the United States, which gives to Congress, exclusively, the right to regulate commerce between the states, is opposed by the constitution of Mississippi. The argument for the plaintiffs in error, is on the abolition side of the question. The counsel for the defendant sustain the opposite principle.

The object of prohibition in the Constitution of the United

States is to regulate commerce; to sustain it, not to annihilate it. It is conservative. Regulation implies continued existence—life, not death; preservation, not annihilation; the unobstructed flow of the stream, not to check or dry up its waters.

But the object of the abolitionists is to prevent the exercise of this commerce. This is a violation of the right of Congress under the Constitution.

The right of the states to regulate the condition of slaves within their borders, is not denied. It is fully admitted. Every state may, by its laws, fix the character and condition of slaves. The right of Congress to regulate commerce between the different states, which may extend to the regulation of the transportation of slaves from one state to another, as merchandise, does not affect these rights of the states. But to deny the introduction of slaves, as merchandise, into a state, from another state, is an interference with the Constitution of the United States. After their introduction, they are under the laws of the states.

Nor is the power, given by the Constitution of the United States to regulate commerce, one in which the states may participate. It is exclusive. It is essentially so: and its existence in this form is most important to the slave-holding states.

Mr. Webster, also for the defendant in error.

Mr. Webster contended that the construction of the constitution of Mississippi had not been settled by the Courts of the state, and was yet an open question. Contradictory opinions are entertained by the judges of the Courts of Mississippi upon the construction of the provision relative to the introduction of slaves before the act of 1837. In the cases cited by the counsel for the plaintiffs in error, this is apparent. While this Court pays great attention to the settled construction of the laws and constitution of a state, as the same is shown by the uniform and settled decisions of the Courts of the state, it cannot admit the authority of cases not of this character.

The case before the Court is recent. It was depending here before any decision had been made in the Courts of the state, on the points involved in it. Such decisions have not the same authority as those of a fixed and established character.

When the contract on which this suit was brought was made,

no construction like that now claimed had been given to the provision in the constitution. The contract was made, in the belief of all the parties to it, that it was valid and legal. The attempt to avoid it, is to give a retroactive effect to new views of the provision.

For what purpose, but for such as is exhibited in this case, was the judicial power given to the Courts of the United States, to be exercised in controversies between the citizens of different states? This was the very object. It was intended to give the citizens of one state a power to sue citizens of another state, in an independent tribunal. Now, it is contended, that when a citizen of Virginia sues in a Court of the United States, he is to be bound by the decisions of the state tribunals. This defeats the provision in the Constitution of the United States. It is a mockery, if this is to be the law. Under the circumstances of this case, it may safely be said, that, in the matter now before the Court, the decisions of the Courts of Mississippi should have less weight than those of any other Court.

It was from a distrust of state tribunals that the provision of the Constitution of the United States was introduced. The Constitution looks to principles, not to persons. It creates an independent tribunal where, without its provisions, it would not exist. The opinions of the Courts of Mississippi are justly entitled to high respect, as arguments; and the personal character of the judges of those Courts entitle them to great consideration; but beyond these concessions to them, this Court will not go.

1. What is the true meaning of the constitution of Mississippi, as to the introduction of slaves, as merchandise, for sale?

2. Is that provision conformable to the Constitution of the United States?

As to the first question, it is contended that the words of the provision in the constitution of Mississippi are injunctions on the legislature; and until the legislature shall act, there is no prohibition of the introduction of slaves into the state, as merchandise, or for sale.

The words are, "shall be prohibited." There are three modes or forms in which "shall be" may, or ought to be understood. Each is according to the subject-matter. They may

[Groves et al. *v.* Slaughter.]

impose legislative enactments.   2. Enjoin a duty.   3. They may be promissory as to future action, under the constitution.

Different interpretations are given to these words in the same constitution.  The Constitution of the United States declares there shall be universal toleration of religion; there shall be provisions for education; the boundaries of states shall be ascertained; the judicial power of the United States shall be vested in certain Courts.   Thus, the terms impose duties on the legislature to carry into operation the principles established; regulate and fix the extent of legislative powers; and prescribe the manner, in some instances, in which the legislature shall act.  It is repeated: the meaning of the constitution is to be found out by the context, and the subject-matter.

It is contended that every thing on the subject of slaves, is left, by the constitution of Mississippi, to the legislature.

Take the words of the section together, and the sense is clear. Does the section prohibit, by its own terms, the introduction of slaves, by settlers, in 1845?   The words are, that actual settlers "shall not be prohibited" introducing slaves, until after 1845. Is not this a plain injunction on the legislature not to enact laws interfering with the rights of settlers, before 1845?   It is not in itself an enactment.

Why was the provision as to the introduction of slaves, as merchandise, for sale, put six months forward; six months from the adoption of the constitution?  It was to allow time for the legislature to act: it was to give the legislature one session in which laws might be passed.   This was the only reason.   In the intervening period, the legislature was to be in session.

In that session, the legislature took up the subject; and what was done?  An amendment of the constitution was proposed. No law was passed to carry the provision into operation.   So much for the words of the provision in the constitution of Mississippi.

2. As to the subject-matter.   Does it appear that the constitution supposed it was completing its own end, by its own authority; or does it look to legislation?   Does it execute itself?   It is clear, that if it was intended to be in itself a law which would carry into effect the principle declared by it, that it would have

gone further; it would have made provisions which would secure its execution.

Now, in itself, as it stands in the constitution, it is entirely powerless and nugatory. The importation of slaves as merchandise, for sale, was to be prohibited after a fixed period. How prohibited? How prevented? Forfeited, if brought into the state? No such provision. Emancipated? No such provision. The slaves were not to be set free. Neither of these results would follow; and the constitutional declaration, without penalties and further provisions, was a dead letter; a nullity. It could have no operation when the sale of the slaves was made by the defendant in error; far less could it affect a sale on credit, as was the case before the Court. Slaves might be sold for cash, if brought into the state as merchandise, ad libitum. Thus, the provision in the constitution could have no operation, but in cases where the confidence between the seller and the purchaser would seem to give them greater protection from its influence.

If the construction of the words of the constitution claimed by the plaintiffs in error, standing alone, produces these results, another interpretation should be adopted; one of a practical character; one which will execute the purposes of the same; one which will not be at war with honesty, and just principles.

How did the people of Mississippi understand the provision in the constitution? This is a proper method of interpretation. They made the instrument; how did they construe it?

A constitution stands on different ground, as to its interpretation, from a statute; a statute is to be construed by the Courts, which are intrusted with its execution. A constitution is to stand as it is adopted by the people, from whom it has all its weight and authority. If we have clear evidence to show how the people of Mississippi understood this provision, this should prevail.

Suppose a constitution will bear two constructions, may not that in which it was understood by the people prevail, and be received as the best, and as the true construction?

The constitution of Mississippi was adopted on the 26th of October, 1832; and it provided that the introduction of slaves, as merchandise for sale, should cease on the 1st of May, 1833.

[Groves et al. *v.* Slaughter.]

Instead of legislative enactments to carry the provision into execution, at the succeeding session of the legislature, opinions were strongly against the prohibition. An amendment to the constitution, abrogating it in reference to the subject, was introduced, and two-thirds of the legislature concurred in it. It was submitted to the people. It was not adopted, because a sufficient number of the citizens of the state did not vote upon it; but it was approved of by a majority of those who did vote. The constitution required that an amendment should be made by a majority of all the voters in the state.

In December, 1833, the legislature passed a law, laying a tax on slaves introduced for sale. The law required that a bond for the tax should be given by all transient persons, who were the vendors of slaves. This law is an acknowledgment of the legality of their introduction, of the sale of them by those who may have introduced them: provided, the bond to pay the tax was given. This law was passed when it was well known the proviso in the constitution existed; it was passed after May 1st, 1833; and when the defendant in error, a non-resident, was notorious for the introduction of slaves, as merchandise for sale.

Under this law, it is submitted that it was competent for any person to bring in slaves for sale, paying the tax on them. It was under this law the defendant in error acted. The act was an invitation to bring slaves into the state, as merchandise for sale; they were brought; the tax was paid; the slaves were sold, and notes taken for the payment of a part of the purchase money: and after this, the prohibition in the constitution is set up, making it declare the contract for the payment of the note void! The slaves are held by the purchaser, and no offer is made to return them; they are held under the purchase, and not paid for! An attempt is made to give the prohibition blood and muscle to hold the slaves without paying the debt contracted for their purchase!

In 1837 the Governor of the state submitted to the legislature the propriety of prohibiting the sale of slaves by non-residents. In his message he expresses doubts of the operation of the constitutional prohibition, and suggests that a law should be passed to give it effect. The law was passed in 1837. The law is "to prohibit the introduction of slaves as merchandise for sale."

Vol. XV.—2 T.

This was carrying into execution the constitution. No opinion was expressed, that the legislature thought the constitution had made the prohibition effectual. This act recognises the construction of the provision contended for by the defendant in error. The act provides that if any one shall hereafter introduce slaves for sale, &c.

The act proves: 1. That the people of the state did not understand the provision in the constitution as operative, until the legislature should act upon it. That it imposed a duty upon the legislature to act. That all persons had gone on as if no prohibition was in force, until the legislature should pass a law; slaves having been constantly introduced for sale, and sold; the provisions of the law of 1833, as to the payment of taxes, having been complied with by those who introduced them as merchandise for sale.

Is the provision of the constitution of Mississippi, conformable to the Constitution of the United States?

The Constitution confers on Congress the right to regulate commerce. The extent and effect of this grant of power has often been discussed in this Court; but all questions upon it are now fully settled. In the case of Gibbon *v.* Ogden it was decided, that it extends to all commerce between state and state. It was held that the whole subject of commercial regulation was taken from the states, and placed in the hands of Congress.

This must be so, or the whole provision would be inoperative. Nothing, which is a regulation of commerce, can be affected by state laws. Regulation is in what it is considered best to leave free, and exempt from rule. Freedom of regulation, is regulation. Not declaring how action shall take place, allows the action to be performed.

But interior rights, not commercial, may be regulated by the states. If there was no provision in the Constitution of the United States giving to Congress the power to regulate commerce, and an act was passed by a state prohibiting the introduction of slaves for sale, would it not be an interference with commerce between the states?

The powers conferred on Congress, are duties; and they are to be exercised for the good of the states. What is the foundation of the right to slaves? There is no law declaring slaves pro-

perty any more than land. Slaves are property by the term "slaves." The master has a right to their services and labour. This is property.

The Constitution recognises slaves as property. Slaves escaping from the state in which they are held to service and labour may be arrested in other states, and carried back to the state from which they escaped. The right to take them up, is an acknowledgment of the right of property in them. The Constitution was adopted during the existence of slavery in more than one-half of the states; and thus the protection of this right of property in the intercourse between the states became a duty under the Constitution.

While the right and duty in Congress, under its power and duty to regulate commerce between the states, extends to slaves as articles of commerce between the states so long as slavery exists in the states, when slavery is abolished in a state, Congress has no privilege to interpose : in such states, Congress has no power to interfere with the state regulations as to slavery.

If the right in states recognising slavery exists to prohibit trading in them, it will allow non-intercourse between the states of the Union by the legislative enactments of the states; and will authorize retaliation. This is negatived by the decision of this Court in Gibbon *v.* Ogden; and the question is closed. The New York law gave an exclusive right of navigating the waters of the state, by steamboats, to certain persons. The law of New York was made void by the decision of that case. The same result will attend the proviso against the introduction of slaves in the constitution of Mississippi, when the constitutionality of the same shall be brought, necessarily, before this Court.

The Court are called upon to say that the state of Mississippi may prohibit the transportation into that state of any particular article. The Court will be obliged to find out something in the introduction of slaves different from trading in other property. This will be difficult.

Suppose, under some excitement, the introduction of cotton into the state of Massachusetts had been prohibited, and this was retaliated by a prohibition of the introduction into a cotton planting state of cotton fabrics. Would not this be an interference with the power of Congress to regulate commerce ? Slaves

are as much property in Mississippi and in Carolina, as cotton. All the states have not slaves, nor do all the states plant cotton. Can states interfere with the introduction of articles which Congress have left free? There are exceptions; such as quarantine regulations, pilotage; but the subject of this inquiry is different. The prohibition of the constitution of Mississippi is a regulation of commerce, intercourse, merchandise.

The strongest motives to establish the Constitution of the United States, was the regulation of commerce and intercourse between the states, and with foreign states; to make the United States, in this respect, a unit. It may not be easy to draw the line so as to distinguish what may and what may not be an interference with the provisions of the Constitution of the United States. But this is not such a case. This is a clear case. In any matters of the sale and purchase of property, the states cannot interfere.

The opening and concluding arguments of Mr. Walker, for the plaintiffs in error, prepared with great ability and care by himself, were found too large to be included in the body of the report. They are inserted in this volume, as an appendix, with the approbation of Mr. Walker.

Mr. Justice THOMPSON delivered the opinion of the Court.

On the 5th of April, 1838, a suit was commenced by the defendant in error, against the plaintiffs in error, in the Circuit Court of the United States, for the Eastern District of Louisiana, upon a note, a copy of which is set out in the record, as follows:

*Natchez, December 20th, 1836.*

Twelve months after date; I promise to pay to R. M. Roberts, or order, the sum of seven thousand dollars, for value received, payable and negotiable at the Commercial Bank of Natchez, state of Mississippi. JOHN W. BROWN.
Endorsed by:

      R. M. ROBERTS,
      MOSES GROVES,
      JAMES GRAHAM.

In the course of the proceedings in the cause, the following agreement, or admitted statement of facts, was entered into between the parties.

[Groves et al. *v.* Slaughter.]

" In this case, it is consented that the question of fraud is waived by the defendants, except as hereinafter reserved. The case is to be defended, solely, on the question of the legality and validity of the consideration for which the note sued on was given. It is admitted, that the slaves for which said note was given, were imported into Mississippi, as merchandise, and for sale, in the years 1835 and 1836, by the plaintiff; but without any previous agreement or understanding, express or implied, between the plaintiff and any of the parties to the note; but for sale, generally, to any person who might wish to purchase. The slaves have never been returned to the plaintiff, nor tendered to him by any of the parties to the note sued on."

Whereupon, the Court gave judgment for the plaintiff below for seven thousand dollars, with the interest and costs. And this judgment is brought here by writ of error, for revision.

It will be seen from this statement of the case, that the defence rested entirely upon the alleged illegality of the consideration in the note. And the validity of the defence must turn upon the construction and operation of the following article in the constitution of Mississippi, adopted on the 26th of October, 1832.

" The introduction of slaves into this state, as merchandise, or for sale, shall be prohibited, from and after the first day of May, eighteen hundred and thirty-three: Provided, that the actual settler, or settlers, shall not be prohibited from purchasing slaves in any state in this Union, and bringing them into this state for their own individual use, until the year eighteen hundred and forty-five."

It has been urged on the argument, by way of preliminary objection to an examination of the construction of the constitution, that this article has received a judicial interpretation in the Courts of Mississippi, which, according to the doctrine of this Court, with respect to state decisions upon their own laws and constitutions, will control the judgment of this Court upon this question. It becomes necessary, therefore, to look into those decisions, to see whether there has been such a fixed and settled construction given to the constitution as to preclude this Court from considering it an open question.

The case chiefly relied upon is that of Glidewell and others *v.* Hite and Fitzpatrick, a newspaper report of which has been

furnished to the Court. It was a bill in equity filed some time in the year 1839, since the commencement of the suit now before this Court, and the decree of the Chancellor, affirmed in the Court of Appeals by a divided Court, since the judgment was obtained in this cause. But if we look into that case, and the points there discussed, and the diversity of opinion entertained by the judges, we cannot consider it as settling the construction of the constitution.

It was a bill filed in the Court of Chancery to enjoin a judgment recovered at law, upon a bond for the purchase of slaves introduced in that state after the 1st of May, 1833. The Chancellor refused to continue the injunction, on the ground that the matter relied upon to obtain the injunction should have been set up as a defence, in the suit at law; and this view of the case, he adds, might be decisive; but another question of some moment is raised, which must frequently arise in our Courts, and which it is well to put in a train for ultimate decision : clearly announcing that the question he was about to discuss was not involved in the decision of the case before him, and of course all opinion which he might express would be extra judicial. He then proceeds to examine the constitution in reference to its operation on the bond upon which the judgment at law had been obtained; and concludes, that the violation of the constitution consisted in the introduction of the slaves, and not in the sale, and that, therefore, a subsequent sale after the introduction was not unlawful, and of course the bond given for the purchase was not void, on the ground of illegal consideration : and he adds, if the contract should be considered void, the defendants would be entitled to the negroes; for, although their introduction might be illegal, and subject the party to criminal prosecution, yet the title to the negroes would not be forfeited. And to show more fully, he says, his understanding of the constitution : "I mean to declare, that the moment the negroes were introduced as merchandise, or for sale, the offence was at once complete : no further step was necessary to bring it within the intent and meaning of the prohibiting clause of the constitution; that it was perfectly immaterial whether the negroes were or were not sold, or offered for sale afterwards; such act would not in any way affect its legal character."

The case went up to the Court of Appeals, and was there affirmed, by a divided Court, two only of the judges being present : Judge Trotter concurring with the Chancellor, that the defence should have been made in the suit at law ; but the other judge dissented upon this point. This was of course the only question in judgment in that case ; and whatever opinions might have been expressed upon other questions, they were extra judicial. Judge Trotter went into an examination of the questions suggested by the Chancellor, and differed entirely from him as to the effect and operation of the prohibition in the constitution. He considered the sale of the slaves the great object intended by the prohibition, with a view to suppress the slave trade in that state. But he thought it immaterial to inquire whether the constitution be considered merely directory, or containing within itself an absolute prohibition. In either case he thought it fixed the policy of the state on the subject, and rendered illegal the practice designed to be suppressed. Had Judge Trotter concurred with the Chancellor in his views of the constitution, the decree of the Chancellor must have been reversed. Thus we see the different views taken by the Courts in Mississippi, as to the object, policy, and effect of this article in the constitution. And as the whole of this discussion arose upon points not necessarily involved in the decision of the case before the Court, it may well be considered as extra judicial. It is unnecessary for this Court to express any opinion, as to the correctness of one or the other of the views taken by the different judges. But this difference of opinion is certainly sufficient to justify this Court in considering that the construction of the constitution in that state is not so fixed and settled as to preclude us from regarding it an open question.

The question arising under the constitution of Mississippi is, whether this prohibition, per se, interdicts the introduction of slaves as merchandise, or for sale, after a given time ; or is only directory to the legislature, and requiring their action in order to bring it into full operation, and render unlawful the introduction of slaves for sale at any time prior to the act of the 13th of May, 1837.

The language of the constitution is, "the introduction of slaves into this state as merchandise, or for sale, shall be prohibited from

and after the 1st day of May, 1833;" with an exception, as to such as may be introduced by actual settlers previous to the year 1845. This obviously points to something more to be done, and looks to some future time, not only for its fulfilment, but for the means by which it was to be accomplished. But the more grammatical construction ought not to control the interpretation, unless it is warranted by the general scope and object of the provision. Under the constitution of 1817, it is declared that the legislature shall have power to prevent slaves being brought into the state as merchandise. The time and manner in which this was to be done, was left to the discretion of the legislature. And by the constitution of 1832, it was no longer left a matter of discretion when this prohibition is to take effect; but the 1st day of May, 1833, is fixed as the time. But there is nothing in this provision which looks like withdrawing the whole subject from the action of the legislature. On the contrary, there is every reason to believe, from the mere naked prohibition, that it looked to legislative enactments to carry it into full operation. And indeed this is indispensable. There are no penalties or sanctions provided in the constitution for its due and effectual operation. The constitution of 1832 looks to a change of policy on the subject, and fixes the time when the entire prohibition shall take effect. And it is a fair and reasonable conclusion that this was the only material change from the constitution of 1817. It will not answer to say this arose from any distrust of the legislature. Such a supposition would be entirely gratuitous, and a reflection that could not be justified. And, besides, if any such conjecture is to be indulged, it is inconceivable why some further provision was not made in the constitution to insure obedience to the prohibition, by declaring the effect of a violation thereof. Admitting the constitution is mandatory upon the legislature, and that they have neglected their duty in not carrying it into execution, it can have no effect upon the construction of this article. Legislative provision is indispensable to carry into effect the object of this prohibition. It requires the sanction of penalties to effect this object. How is a violation of this prohibition to be punished? Admitting it would be a misdemeanor, punishable by fine, this would be entirely inadequate to the full execution of the object intended to be accomplished. What would

become of the slaves thus introduced? Will they become free immediately upon their introduction, or do they become forfeited to the state? These are questions not easily answered. And although these difficulties may be removed by subsequent legislation, yet they are proper circumstances to be taken into consideration, when we are inquiring into the intention of the convention in thus framing this article. It is unreasonable to suppose that if this prohibition was intended, per se, to operate without any legislative aid, that there would not have been some guards and checks thrown around it to insure its execution. But if it is considered merely directory to the legislature, it is open to all necessary provisions to accomplish the end intended. The proviso in this article, that actual settlers "shall not be prohibited" from bringing in slaves for their own use until the year 1845; must necessarily be considered as addressed to the legislature, and must be construed as a restriction upon their power. The enacting part of the article, "shall be prohibited," is also addressed to the legislature; and is a command to do a certain act. The legislative enactments on this subject strongly fortify the conclusion that this provision in the constitution was not understood as a prohibition per se, but only directory to the legislature. On the 2d of March, 1833, which was previous to the time when this prohibition was to go into operation, a law was passed to alter and amend this article, as follows: "the legislature of this state shall have, and are hereby vested with power to pass from time to time such laws, regulating or prohibiting the introduction of slaves in this state, as may be deemed proper and expedient." This required, under the constitution, the concurrence of two-thirds of each branch of the legislature. Notice was accordingly given, as required by the constitution, to take the sense of the qualified electors of the state upon the proposed amendment. It certainly could not have been the understanding of the legislature that the prohibition in the constitution was actually in full force and operation from the 1st of May, 1833, whilst these proceedings to obtain an amendment of the constitution were going on; and, especially, when, in December, 1833, a law was passed laying a tax on slaves so brought in. This would be an unreasonable construction, and would be holding out false and deceptive colours to those engaged in that traffic. It is more reasona-

ble to conclude that the legislature supposed some legislative action on their part was necessary to carry into operation the prohibition; assuming on themselves to postpone such legislation until the sense of the people could be taken on the proposed amendment. That such must have been the understanding of the legislature, is obvious from the provisions of the act of December, 1833, laying a tax on slaves thus brought in for sale. If the constitution, per se, operated as an absolute prohibition to bring in slaves as merchandise after the 1st of May, 1833, the law of December, 1833 would be laying a tax upon slaves illegally introduced. This would be impliedly sanctioning the illegal introduction of the slaves; and would present an incongruity in legislation that never ought to be presumed. But to construe the constitution as directory only to the legislature, the whole will be consistent and stand together. Although the legislature may have omitted to do what the constitution enjoined upon them, this is a matter with which this Court can have no concern.

But if any thing more can be wanting to show that the legislative interpretations of the constitution, from the year 1832 to 1837, has been that this article does not, per se, operate as a prohibition to the introduction of slaves, as merchandise, but required legislative action to bring it into complete operation; it will be found in that act of the 13th of May, 1837. Until that time, it is manifest from the whole current of legislation upon that subject, and the proposition to amend the constitution in that particular, that there was great diversity of opinion in relation to this matter. But the act of 1837 purports to carry into effect the injunctions in the constitution. It adopts the words of the constitution, and declares that, "hereafter, the business of introducing or importing slaves into this state, as merchandise, or for sale, be, and the same is hereby, prohibited." Here, then, is a compliance with the injunction in the constitution, by a direct prohibition. This law does not assume that such prohibition was in force by virtue of the constitutional provision. Upon such hypothesis, this prohibition in the law would be entirely superfluous, and the act would have proceeded to provide for enforcing the constitutional prohibitions. But to consider the article in the constitution as directory to the legislature to prohibit the introduction of slaves,

this law is a literal compliance with the injunction; and not only enacts a prohibition, but provides the necessary penalties for a violation of that prohibition, and declares all contracts made in relation thereto to be void.   This is carrying into full execution the injunction of the constitution; and affords a strong and irresistible conclusion, that, in the opinion of the legislature, that prohibition had not been in operation until the passage of that law. To declare all contracts made for the purchase of slaves introduced, as merchandise, from the 1st of May, 1833 until the passage of this law, in 1837, illegal and void, when there was such an unsettled state of opinion and course of policy pursued by the legislature, would be a severe and rigid construction of the constitution, and one that ought not to be adopted unless called for by the most plain and unequivocal language.   It is said by Judge Trotter, that he considers it immaterial whether the constitution be construed as merely directory, or as containing within itself an absolute prohibition.   In either case it fixes the policy of the state.   His idea, however, of the policy of the state upon this subject, differs essentially from that of the Chancellor. We do not mean to say that if there appeared to have been a fixed and settled course of policy in that state against allowing the introduction of slaves, for merchandise, or for sale, that a contract, made in violation of such policy, would not be void. But we cannot think that this principle applies to this case. When the sale of the slaves in question was made, there was certainly, no fixed and settled course of policy which would make void or illegal such contracts.

The judgment of the Circuit Court is accordingly affirmed. And this view of the case makes it unnecessary to inquire whether this article in the constitution of Mississippi is repugnant to the Constitution of the United States; and, indeed, such inquiry is not properly in the case, as the decision has been placed entirely upon the construction of the constitution of Mississippi.

Mr. Justice M'LEAN.

As one view of this case involves the construction of the Constitution of the United States in a most important part, and in regard to its bearing upon a momentous and most delicate subject, I will state in a few words my own views on that branch

of the case. The case has been argued with surpassing ability on both sides. And although the question I am to consider, is not necessary to a decision of the case; yet, it is so intimately connected with it, and has been so elaborately argued, that under existing circumstances I deem it fit and proper to express my opinion upon it.

The second section of the constitution of Mississippi, adopted the 26th of October, 1832, declares that the introduction of slaves into that state, as merchandise, or for sale, shall be prohibited from and after the 1st day of May, 1833: provided, that the actual settlers shall not be prohibited from purchasing slaves in any state in the Union, and bringing them into that state for their own individual use, until the year 1845: and the question is, whether this provision is in conflict with that part of the Constitution of the United States, which declares that Congress shall have power "to regulate commerce with foreign nations, and among the several states."

In the case of Gibbons *v.* Ogden, 9 Wheat. 186, this Court decided, that the power to regulate commerce is exclusively vested in Congress, and that no part of it can be exercised by a state.

The necessity of a uniform commercial regulation, more than any other consideration, led to the adoption of the federal Constitution. And, unless the power be not only paramount, but exclusive, the Constitution must fail to attain one of the principal objects of its formation.

It has been contended that a state may exercise a commercial power, if the same has not been exercised by Congress. And that this power of the state ceased when the federal authority was exerted over the same subject matter.

This argument is founded upon the supposition that a state may exercise a power which is expressly given to the federal government, if it shall not exert the power in all the modes, and over all the subjects to which it can be applied. If this rule of construction were generally adopted and practically enforced, it would be as fatal to the spirit of the constitution as it is opposed to its letter.

If a commercial power may be exercised by a state because it has not been exercised by Congress, the same rule must apply to other powers expressly delegated to the federal government.

It is admitted that the power of taxation is common to the state and federal governments; but this is not in its nature or effect a repugnant power; and its exercise is vital to both governments.

A power may remain dormant, though the expediency of its exercise has been fully considered. It is often wiser and more politic to forbear, than to exercise a power.

A state regulates its own internal commerce, may pass inspection and police laws, designed to guard the health and protect the rights of its citizens. But these laws must not be extended so as to come in conflict with a power expressly given to the federal government.

It is enough to say that the commercial power, as it regards foreign commerce, and commerce among the several states, has been decided by this Court to be exclusively vested in Congress.

Under the power to regulate foreign commerce Congress impose duties on importations, give drawbacks, pass embargo and non-intercourse laws, and make all other regulations necessary to navigation, to the safety of passengers, and the protection of property. Here is an ample range, extending to the remotest seas where the commercial enterprise of our citizens shall go, for the exercise of this power.

The power to regulate commerce among the several states is given in the same section, and in the same language. But it does not follow that the power may be exercised to the same extent.

The transportation of slaves from a foreign country, before the abolition of that traffic, was subject to this commercial power. This would seem to be admitted in the Constitution, as it provides " the importation of such persons as any of the states, now existing, shall think proper to admit, shall not be prohibited by Congress prior to the year eighteen hundred and eight: but a tax or duty, may be imposed on such importation, not exceeding ten dollars for each person."

An exception to a rule is said to prove the existence of the rule; and this exception to the exercise of the commercial power, may well be considered as a clear recognition of the power in the case stated. The United States are considered as a unit, in all regulations of foreign commerce. But this cannot be the case

where the regulations are to operate among the several states. The law must be equal and general in its provisions. Congress cannot pass a non-intercourse law, as among the several states; nor impose an embargo that shall affect only a part of them.

Navigation, whether on the high seas, or in the coasting trade, is a part of our commerce; and, when extended beyond the limits of any state, is subject to the power of Congress. And, as regards this intercourse, internal or foreign, it is immaterial whether the cargo of the vessel consists of passengers, or articles of commerce.

Can the transfer and sale of slaves from one state to another, be regulated by Congress, under the commercial power?

If a state may admit or prohibit slaves at its discretion, this power must be in the state, and not in Congress. The Constitution seems to recognise the power to be in the states. The importation of certain persons, meaning slaves, which was not to be prohibited before eighteen hundred and eight, was limited to such states, then existing, as shall think proper to admit them. Some of the states at that time prohibited the admission of slaves, and their right to do so was as strongly implied by this provision as the right of other states that admitted them.

The Constitution treats slaves as persons. In the second section of the first article which apportions representatives, and directs taxes among the states, it provides, "the numbers shall be determined, by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons." And again, in the third section of the fourth article, it is declared that "no person, held to service or labour in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labour, but shall be delivered up on claim of the party to whom such service or labour may be due."

By the laws of certain states, slaves are treated as property; and the constitution of Mississippi prohibits their being brought into that state by citizens of other states, for sale, or as merchandise. Merchandise is a comprehensive term, and may include every article of traffic, whether foreign or domestic, which

is properly embraced by a commercial regulation.   But if slaves are considered in some of the states as merchandise, that cannot divest them of the leading and controlling quality of persons by which they are designated in the Constitution.   The character of property is given them by the local law.   This law is respected, and all rights under it are protected by the federal authorities; but the Constitution acts upon slaves as persons, and not as property.

In all the old states, at the time of the Revolution, slavery existed in a greater or less degree.   By more than one half of them, including those that have been since admitted into the Union, it has been abolished or prohibited.   And in these states, a slave cannot be brought as merchandise, or held to labour, in any of them, except as a transient person.

The constitution of Ohio declares that there shall be neither slavery nor involuntary servitude in the state, except for the punishment of crimes.   Is this provision in conflict with the power in Congress to regulate commerce?   It goes much further than the constitution of Mississippi.   That prohibits only the introduction of slaves into the state by the citizens of other states, as merchandise; but the constitution of Ohio not only does this, but it declares that slavery shall not exist in the state.   Does not the greater power include the lesser.   If Ohio may prohibit the introduction of slaves into it altogether, may not the state of Mississippi regulate their admission?

The Constitution of the United States operates alike on all the states: and one state has the same power over the subject of slavery as every other state.   If it be constitutional in one state to abolish or prohibit slavery, it cannot be unconstitutional in another, within its discretion, to regulate it.

Could Ohio, in her constitution, have prohibited the introduction into the state, of the cotton of the south, or the manufactured articles of the north?   If a state may exercise this power, it may establish a non-intercourse with the other states.   This, no one will pretend, is within the power of a state.   Such a measure would be repugnant to the Constitution, and it would strike at the foundation of the Union.   The power vested in Congress to regulate commerce among the several states, was designed to prevent commercial conflicts among them.   But, whilst Ohio

[Groves et al. *v.* Slaughter.]

could not proscribe the productions of the south, nor the fabrics of the north, no one doubts its power to prohibit slavery. And what can more unanswerably establish the doctrine that a state may prohibit slavery, or, in its discretion, regulate it, without trenching upon the commercial power of Congress?

The power over slavery belongs to the states respectively. It is local in its character, and in its effects; and the transfer or sale of slaves cannot be separated from this power. It is, indeed, an essential part of it.

Each state has a right to protect itself against the avarice and intrusion of the slave dealer; to guard its citizens against the inconveniences and dangers of a slave population.

The right to exercise this power, by a state, is higher and deeper than the Constitution. The evil involves the prosperity, and may endanger the existence of a state. Its power to guard against, or to remedy the evil, rests upon the law of self-preservation; a law vital to every community, and especially to a sovereign state.

Mr. Chief Justice TANEY.

I had not intended to express an opinion upon the question raised in the argument in relation to the power of Congress to regulate the traffic in slaves between the different states, because the Court have come to the conclusion, in which I concur, that the point is not involved in the case before us. But, as my Brother M'Lean has stated his opinion upon it, I am not willing, by remaining silent, to leave any doubt as to mine.

In my judgment, the power over this subject is exclusively with the several states; and each of them has a right to decide for itself, whether it will or will not allow persons of this description to be brought within its limits, from another state, either for sale, or for any other purpose; and, also, to prescribe the manner and mode in which they may be introduced, and to determine their condition and treatment within their respective territories: and the action of the several states upon this subject, cannot be controlled by Congress, either by virtue of its power to regulate commerce, or by virtue of any other power conferred by the Constitution of the United States. I do not, however, mean to argue this question; and I state my opinion upon it, on account

of the interest which a large portion of the Union naturally feel in this matter, and from an apprehension that my silence, when another member of the Court has delivered his opinion, might be misconstrued.

Another question of constitutional law has also been brought into discussion, that is to say, whether the grant of power to the general government, to regulate commerce, does not carry with it an implied prohibition to the states to make any regulations upon the subject, even although they should be altogether consistent with those made by Congress.

I decline expressing any opinion upon this question, because it is one step further out of the case really before us; and there is nothing in the character of the point that seems to require a voluntary declaration of opinion by the members of the Court.

It is admitted on all hands, that if a state makes any regulation of commerce inconsistent with those made by Congress, or in any degree interfering with them, the regulation of the state must yield to those of the general government. No one, I believe, doubts the controlling power of Congress in this respect; nor their right to abrogate and annul any and every regulation of commerce made by a state. But the question upon which different opinions have been entertained, is this: would a regulation of commerce, by a state, be valid until Congress should otherwise direct; provided such regulation was consistent with the regulations of Congress, and did not in any manner conflict with them?

No case has yet arisen which made it necessary, in the judgment of the Court, to decide this question. It was treated as an open one, in the case of The City of New York *v.* Milne, 11 Peters, 102, decided at January term, 1837, as will appear by the opinions then delivered; and since that time the point has never, in any form, come before the Court. Nor am I aware that there is any reason for supposing that such a case is likely to arise. For the states have very little temptation to make a regulation of commerce, when they know it may be immediately annulled by an act of Congress, even if it does not at the time it is made by the state, conflict with any law of the general government. Besides, the regulations of Congress, already made, appear to cover the whole, or very nearly the whole ground; and in the very few

2 U 2

[Groves et al. *v.* Slaughter.]

instances in which the laws of states have been held to be regulations of commerce, and on that account declared to be void, the state regulation was found to be in conflict with some existing regulation of the general government; and, consequently, the question above stated did not arise.

The point in dispute, therefore, would seem to be but little more than an abstract question which the Court may never be called on to decide; and, perhaps, like other abstract questions, it is destined, on that very account, to be more frequently and earnestly discussed. But until some case shall bring it here for decision, and until some practical purpose is to be answered by deciding it, I do not propose to engage in the discussion, nor to express an opinion.

Mr. Justice STORY, Mr. Justice THOMPSON, Mr. Justice WAYNE, and Mr. Justice M'KINLEY concurred with the majority of the Court in opinion that the provision of the Constitution of the United States, which gives the regulation of commerce to Congress, did not interfere with the provision of the constitution of the state of Mississippi, which relates to the introduction of slaves as merchandise, or for sale.

Mr. Justice BALDWIN.

As this case has been decided on its merits, and the opinion of the Court covers every point directly involved, I had not thought that any merely collateral question would have been noticed; for I cannot believe that, in the opinion of any of the judges it is at all necessary to inquire what would have been the result, if the Court had held that the contract on which this suit was brought, was void by the laws or constitution of Mississippi. The questions which would have arisen in such an event, are of the highest importance to the country; and, in my opinion, ought not to be considered by us, unless a case arises in which their decision becomes indispensable: when too much deliberation cannot be had before a judgment is pronounced upon them. But since a different course has been taken by the judges who have preceded me, I am not willing to remain silent; lest it may be inferred that my opinion coincides with that of the judges who have now expressed theirs.

[Groves et al. *v.* Slaughter.]

That the power of Congress "to regulate commerce among the several states," is exclusive of any interference by the states, has been, in my opinion, conclusively settled by the solemn opinions of this Court, in Gibbons *v.* Ogden, 9 Wheat. 186—222, and in Brown *v.* Maryland, 12 Wheat. 438—446. If these decisions are not to be taken as the established construction of this clause of the Constitution, I know of none which are not yet open to doubt; nor can there be any adjudications of this Court, which must be considered as authoritative upon any question, if these are not to be so on this.

Cases may, indeed, arise, wherein there may be found difficulty in discriminating between regulations of "commerce among the several states," and the regulations of "the internal police of a state;" but the subject-matter of such regulations, of either description, will lead to the true line which separates them, when they are examined with a disposition to avoid a collision between the powers granted to the federal government, by the people of the several states, and those which they have reserved exclusively to themselves. "Commerce among the states," as defined by this Court, is "trade," "traffic," "intercourse," and dealing in articles of commerce between states, by its citizens or others, and carried on in more than one state. Police, relates only to the internal concerns of one state, and commerce, within it, is purely a matter of internal regulation, when confined to those articles which have become so distributed as to form items in the common mass of property. It follows, that any regulation which affects the commercial intercourse between any two or more states, referring solely thereto, is within the powers granted exclusively to Congress; and that those regulations which affect only the commerce carried on within one state, or which refer only to subjects of internal police, are within the powers reserved. The opinion of this Court, in Milne *v.* New York, 11 Peters, 130, &c., draws the true line between the two classes of regulations; and gives an easy solution to any doubt which may arise on the clause of the constitution of Mississippi, which has been under our consideration. It does not purport to be a regulation of police, for any defined object connected with the internal tranquillity of the state, the health, or morals of the people: it is general in its terms: it is aimed at the introduction of slaves as me

chandise from other states, not with the intention of excluding diseased, convicted, or insurgent slaves, or such as may be otherwise dangerous to the peace or welfare of the state. Its avowed object is to prevent them from being the subjects of commercial intercourse with other states, when introduced for the purpose of sale; while the next clause expressly legalizes their introduction by settlers within the state, for their own use, leaving them at liberty to sell the slaves so introduced, immediately afterwards. It was not intended to affect the condition of the slaves, for there is no provision for their emancipation, or other disposition when introduced into the state for sale; so that the only effect which the broadest construction could give to the constitution of Mississippi, would be to prohibit the introduction into that state, of slaves from other states as articles of commerce, without the least reference to any object of internal police. Their introduction was legal or illegal, according to their disposition when introduced; if intended for sale, it was illegal; if for use by settlers in the state, it was legal, whatever might be the condition of the slave as to health, or his character as to morals. If we adopt the construction contended for by the plaintiffs in error, that it operates by its own force, the constitution of Mississippi must be taken to be a law of that state in relation to the regulation of the traffic or dealing in slaves brought there for the purpose of sale; in other words, a regulation of commerce among the several states, if slaves are the subjects of such commerce, according to the true meaning of the Constitution of the United States, as expounded by this Court.

Other judges consider the Constitution as referring to slaves only as persons, and as property, in no other sense than as persons escaping from service; they do not consider them to be recognised as subjects of commerce, either "with foreign nations," or "among the several states;" but I cannot acquiesce in this position. In other times, and in another department of this government, I have expressed my opinion on this subject; I have done it in judgment in another place, 1 Bald. R. 576, &c.; and feel it a duty to do it here, however unexpectedly the occasion may have arisen; and to speak plainly and explicitly, however unsuited to the spirit of the times, or prevalent opinions any-

where, or by any persons, my views may be. That I may stand alone among the members of this Court, does not deter me from declaring that I feel bound to consider slaves as property, by the law of the states before the adoption of the Constitution, and from the first settlement of the colonies; that this right of property exists independently of the Constitution, which does not create, but recognises and protects it from violation, by any law or regulation of any state, in the cases to which the Constitution applies.

It was a principle of the Revolution, and the practical construction of the Declaration of Independence, that " necessity or expediency" justified " the refusal of liberty, in certain circumstances, to persons of a particular colour ;" and that those to whom their services and labour were due, were their "owners." 1 Laws U. S. 24, 25. In the 7th article of the preliminary treaty of peace with Great Britain, there is this expression, " negroes, or other property.", Ibid. 198. Also, in the 7th article of the definitive treaty, (ibid. 204;) which conclusively shows the then accepted understanding of the country: and that it was not different after the adoption of the Constitution, appears as conclusively, by the 1st article of the Treaty, of Ghent, which refers to " any slaves, or other private property." Ibid. 694. It would be a strange position, indeed, if we were to consider slaves as persons merely, and not property, in our commercial relations with foreign nations; and yet declare them to be " private property," in our diplomatic relations with them, and in the most solemn international acts, from 1782 to 1815.

At the adoption of the Constitution slaves were as much the subjects and articles of " commerce with foreign nations," and among " the several states," as any other species of merchandise; they were property for all purposes, and to all intents; they were bought and sold as chattels; the property in them passed by a bill of sale, by descent, or by will; and they were sold on execution wherever slavery existed. Their importation was lawful; and all power was taken from Congress to prohibit it prior to 1808, so long as the states should think proper to admit them; though a duty, or tax, might be imposed on such person, not exceeding ten dollars for each. Art. 1. sect. 9.

This clause of the Constitution has been held to be an excep-

tion to the power of Congress to regulate commerce; the word "migration" applying to those persons who come voluntarily, and "importation" applying to those persons who are brought involuntarily; (9 Wh. 216;) so that if this clause had not been introduced, the power to prohibit the importation would have resulted, from the general grant of power to regulate commerce. For no rule is better settled, than that the effect of an exception is to take the case excepted out of the general provision, thereby excluding what would otherwise be embraced. 12 Wh. 440. The conclusion, therefore, is inevitable, that slaves were embraced by the Constitution as the subjects of commerce and commercial regulations, to the same extent as other goods, wares, or merchandise. On no other construction can the ninth section of the first article be taken as an exception to the third clause of the eighth section; and when so taken, there is no escape from the construction declared in the opinion of the Court, in Gibbons *v.* Ogden. Besides, if the power to regulate commerce does not include the power to prohibit the importation of slaves into the United States after 1808, when the exception in the ninth section of the first article does not operate, such power is not to be found in any other grant by the Constitution; the consequence of which will be, that all the existing laws for abolishing the slave trade are unconstitutional; or, at the best, their power will rest entirely on the remote and doubtful implication of a new grant, by the ninth section, of a power after 1808, which would not have existed had not that section been introduced. This would be a dangerous rule by which to construe the Constitution, and as inconsistent with its whole scope as it would be hazardous to its permanency. On the other hand, by holding the power to regulate commerce to be the grant of a power to abolish the foreign slave trade, by taking the ninth section as a temporary exception, and the exception to be inoperative after 1808, the slave-trade laws since passed are clearly unconstitutional under an expressly granted power; which is a much more satisfactory position on which to plant them, than any implication or inference.

Slaves, then, being articles of commerce with foreign nations, up to 1808, and until their importation was prohibited by Congress, they were also articles of commerce among the several states, which recognised them as property capable of being trans-

ferred from hand to hand as chattels. Whether they should be so held or not, or what should be the extent of the right of property in the owner of a slave, depended on the law of each state ; that was and is a subject on which no power is granted by the Constitution to Congress; consequently, none can be exercised, directly or indirectly. It is a matter of internal police, over which the states have reserved the entire control ; they, and they alone, can declare what is property capable of ownership, absolute or qualified : they may continue or abolish slavery at their pleasure, as was done before, and has been done since the Constitution ; which leaves this subject untouched and intangible, except by the states.

As each state has plenary power to legislate on this subject, its laws are the test of what is property; if they recognise slaves as the property of those who hold them, they become the subjects of commerce between the states which so recognise them, and the traffic in them may be regulated by Congress, as the traffic in other articles; but no farther. Being property by the law of any state, the owners are protected from any violations of the rights of property by Congress, under the fifth amendment of the Constitution ; these rights do not consist merely in ownership, the right of disposing of property of all kinds, is incident to it, which Congress cannot touch. The mode of disposition is regulated by the state or common law ; and but for the first clause in the second section of the fourth article of the Constitution of the United States, a state might authorize its own citizens to deal in slaves, and prohibit it to all others.

But that clause secures to the citizens of all the states, " all privileges and immunities of citizens" of any other state, whereby any traffic in slaves or other property, which is lawful to the citizens or settlers of Mississippi, with each other, is equally protected when carried on between them and the citizens of Virginia. Hence, it is apparent, that no state can control this traffic, so long as it may be carried on by its own citizens, within its own limits; as part of its purely internal commerce. any state may regulate it according to its own policy ; but when such regulation purports to extend to other states or their citizens, it is limited by the Constitution, putting the citizens of all on the same footing as their own. It follows, likewise, that any power

of Congress over the subject is, as has been well expressed by one of the plaintiffs' counsel, conservative in its character, for the purpose of protecting the property of the citizens of the United States, which is a lawful subject of commerce among the states, from any state law which affects to prohibit its transmission for sale from one state to another, through a third or more states.

Thus, in Ohio, and those states to which the ordinance of 1787 applies, or in those where slaves are not property, not subjects of dealing or traffic among its own citizens, they cannot become so when brought from other states; their condition is the same as those persons of the same colour already in the state; subject in all respects to the provisions of its law, if brought there for the purposes of residence or sale. If, however, the owner of slaves in Maryland, in transporting them to Kentucky, or Missouri, should pass through Pennsylvania, or Ohio, no law of either state could take away or affect his right of property; nor, if passing from one slave state to another, accident or distress should compel him to touch at any place within a state, where slavery did not exist. Such transit of property, whether of slaves or bales of goods, is lawful commerce among the several states, which none can prohibit or regulate, which the constitution protects, and Congress may, and ought to preserve from violation. Any reasoning or principle which would authorize any state to interfere with such transit of a slave, would equally apply to a bale of cotton, or cotton goods; and thus leave the whole commercial intercourse between the states liable to interruption or extinction by state laws, or constitutions. It is fully within the power of any state to entirely prohibit the importation of slaves of all descriptions, or of those who are diseased, convicts, or of dangerous or immoral habits or conduct; this is a regulation of police, for purposes of internal safety to the state, or the health and morals of its citizens, or to effectuate its system of policy in the abolition of slavery. But where no object of police is discernible in a state law or constitution, nor any rule of policy, other than that which gives to its own citizens a " privilege," which is denied to citizens of other states, it is wholly different. The direct tendency of all such laws is partial, anti-national, subversive of the harmony which should exist among the states, as well as inconsistent with the most

[Groves et al. v. Slaughter.]

sacred principles of the constitution; which on this subject have prevailed through all time, in and among the colonies and states, and will be found imbodied in the second resolution of the Virginia legislature, in 1785. 1 Laws of the United States, 53. For these reasons, my opinion is that had the contract in question been invalid by the constitution of Mississippi, it would be valid by the Constitution of the United States. These reasons are drawn from those principles on which alone this government must be sustained; the leading one of which is, that wherever slavery exists by the laws of a state, slaves are property in every constitutional sense, and for every purpose, whether as subjects of taxation, as the basis of representation, as articles of commerce, or fugitives from service. To consider them as persons merely, and not property, is, in my settled opinion, the first step towards a state of things to be avoided only by a firm adherence to the fundamental principles of the state and federal governments, in relation to this species of property. If the first step taken is a mistaken one, the successive ones will be fatal to the whole system. I have taken my stand on the only position which, in my judgment, is impregnable; and feel confident in its strength, however it may be assailed in public opinion, here or elsewhere.

Mr. Justice CATRON, having been indisposed, did not sit in this case.

Mr. Justice M'KINLEY dissented from the opinion of the Court, as delivered by Mr. Justice THOMPSON: and Mr. Justice STORY also dissented; both these justices considering the notes sued upon void.

Mr. Justice BARBOUR died before the case was decided.

These causes came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and were argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages, at the rate of six per centum per annum.