## THE PEOPLE, *ex rel.* Silas Olmsted, *vs.* THE BOARD OF SUPERVISORS OF THE COUNTY OF WESTCHESTER.

There is no statutory limitation of the time within which writs of mandamus may be obtained, in this state.

Where the party seeks the enforcement of a substantial right, by means of a mandamus, he should be allowed the time given by statute to obtain a remedy for injuries essentially of a similar character, in the ordinary way, if that could be pursued.

Where a statute requires a board of supervisors to exercise a discretion in regard to the performance of an act, and they determine that they have no power over the subject, and refuse to act in the matter, all that the supreme court can do, is to issue a mandamus directing them to proceed and *exercise the discretion* and powers conferred upon them by the statute. It can not issue a peremptory mandamus requiring them to perform the act.

A peremptory mandamus must correspond with the alternative writ, in respect to the thing required to be done.

The People *v.* Supervisors of Westchester.

The provisions of the act of May 10, 1845, relative to the assessment of the damages of the owners of land taken for new highways, (*Laws of* 1845, *p.* 184,) were abrogated by the constitution, when that took effect on the 1st of January, 1847.

DEMURRER to the defendants' return to a writ of alternative mandamus. The writ recited that prior to the month of April, in the year 1847, an application was made, pursuant to the statute, to lay out a public road through lands belonging to Silas Olmsted in the town of Greenburgh in the county of Westchester; that legal proceedings were had thereon, pursuant to the statute, and the commissioners of highways, upon the oath of twelve freeholders, determined to lay out said road or highway, and on the 3d day of April, 1847, made and subscribed an order laying out said road, pursuant to the statute, which order was duly filed and recorded. That on the 19th of April thereafter, Gershom Levinus, one of the commissioners of highways, and two of the assessors of said town assessed the damages of Olmsted by reason of the laying out of said highway through his land, and made and subscribed their certificate thereof, which was duly certified by a justice of the peace. That the said Silas Olmsted considering himself aggrieved by such assessment, on the 26th of April, 1847, signified the same by serving a written notice upon the town clerk, who was also a justice of the peace; by which notice he demanded a review of the assessment and that a jury should be called for that purpose. That a jury was accordingly summoned, who after viewing the premises, &c. on the 12th day of May, 1847, assessed the said Olmsted's damages at five hundred dollars, and made and subscribed their certificate of such assessment. That the said assessment was laid before the board of supervisors of the county of Westchester, at their annual session on the 12th of November, 1847. That the said board refused to act thereon, and passed the following resolution: "Resolved, that in the opinion of this board, the proceedings in relation to assessing damages by reason of the laying out of a highway as existed before January 1st, 1847, have been abrogated by the new constitution, and consequently that they can not entertain any question or resolution relating

thereto." That the board thereupon refused to cause the said assessment of $500 to be levied and collected, as required by law. That a similar application was made to the board of supervisors in November, 1848, and with the like result. That the said board had ever since that time, and always, refused and neglected to cause the said damages, so assessed, to be levied and collected, as required by law. The writ then commanded the said board of supervisors to cause the said $500, so assessed to Olmsted, with interest from February 1, 1848, to be levied and collected in the said town of Greenburgh, pursuant to law; or that they should show cause to the contrary, &c.

The defendants, by their return to the writ, admitted that an application was made to the board of supervisors at the time and for the purpose mentioned in the writ, to assess and levy the said damages. And they alledged that it appeared to said board that all of the proceedings in relation to the laying out of the said road, down to and including the order of the commissioners of highways to lay out the same and the assessment of the damages of the said Silas Olmsted, by the commissioners of highways and the assessors, as well as by the jury, as stated in the writ, took place subsequent to the first day of January, 1847, at which day the new constitution of the state took effect, which declares that when private property shall be taken for any public use, the compensation to be made therefor, when such compensation is not made by the state, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law. That inasmuch as all the proceedings in relation to said road were instituted and took place subsequent to the 1st day of January, 1847, and as no provision had been made by law as was directed in the said new constitution, the board of supervisors was not authorized to assess and levy the said damages on the town of Greenburgh, &c.; and that they thereupon made the resolution and decision set forth in the writ. That the said Silas Olmsted, by his counsel, at the next annual meeting of the board of supervisors [in 1848,] renewed his application to the board, as stated in the writ, and that after hearing counsel for the said

Olmsted and for the town of Greenburgh, the board decided that they would not review their former decision. The return also alledged a dedication of the street, or the right of passage, across his lands, to the public, by Olmsted, previous to his application for an assessment of damages, wherefore the defendants denied that the proceedings to assess the damages were according to law ; or that the defendants unjustly or illegally refused to assess and levy the said damages, as charged in the writ.

The plaintiffs demurred to this return, and assigned several special causes of demurrer.

*J. W. Tompkins,* for the relator

*R. H. Cole* and *W. Silliman,* for the defendants.

S. B. STRONG, J. The objection raised by the counsel for the defendants on the argument, that the relator lost any remedy to which he might have been entitled had he exercised proper diligence, by the lapse of time which intervened between the rejection of his claim by the defendants, and his application to this court for an alternative mandamus, is untenable. There is no statutory limitation of the time within which such prerogative writs may be obtained in this state ; nor was there any in England, previous to the 32d Geo. 3, ch. 58. Before the passage of that act, however, the court of king's bench practically limited the time for applying for an information in the nature of a quo warranto, first to twenty years, and eventually to six years, which latter period was adopted in the statute. The reason why we have not adopted any fixed limitation in this state, is doubtless because it is discretionary with the court to grant or refuse the writ, and in the exercise of such discretion, it is competent to take into consideration any damages or inconvenience which might result from the lapse of time, should the application prevail. Accordingly, the late supreme court, in the case of *The People* v. *The Delaware Common Pleas,* (2 *Wend.* 257,) denied a motion for a mandamus to require the common pleas to

quash an appeal bond, after a lapse of five years. And the same court, in the case of *The People* v. *The Seneca Common Pleas*, (2 *Wend*. 264,) denied a motion for a mandamus to the common pleas to require a justice of the peace to amend his return, because there had been a delay of a year after the happening of the alledged error. The court was right in the first case, and possibly in the second, as the object in each was to correct errors in practice, where great vigilance is always required. But it is otherwise where the complaining party seeks the enforcement of a substantial right. There he should be allowed the time given by the statute to obtain a remedy for injuries substantially of a similar character, in the ordinary way, if that could be pursued. In the present case it certainly would not be a judicious exercise of the discretion intrusted to the court in such cases, to refuse a mandamus to a party to give him a compensation for his property taken for public purposes, merely because he had waited some sixteen months after the final refusal of the supervisors to consider his claim, before applying here for relief; especially as it has not been suggested that the delay can be productive of serious injury, in any aspect of the case.

But another, and much more serious, objection to granting the mandamus as asked for by the relator, is, that supposing that the provisions of the act of May 10, 1845, relative to the amount and collection of the damage sustained by the owner of land taken for a new highway, were not abrogated by the present constitution, when that took effect, it is premature to call for a positive requisition upon the defendants to cause the damages to be levied and collected. The seventh section of the act required that a certificate of the amount should be delivered to the board of supervisors, to be *audited*; and that if the supervisor of the town, or any person interested, should feel aggrieved by the assessment, the same should by an order of the board, be referred to any three judges of the county for reconsideration, who should have power to inquire into the principles and fairness of such assessment, and to increase or diminish the damages, as in their judgment should be just and reasonable.

The People *v.* Supervisors of Westchester.

By the eighth section of the act, the judges were required to make their certificate of re-assessment, and to cause the same to be delivered to the board of supervisors, who should cause the amount to be levied and collected as then "*required by law, after a final settlement of damages in such cases by such board.*" Now in this case, the defendants, when the certificate of the amount of damages was presented to them, resolved that in their opinion, the provisions of the act of 1845, relating to the subject, had been abrogated by the new constitution, and that consequently "they could not entertain *any question or resolution*, relating thereto," as set forth by the relator, in the alternative mandamus. They refused to act therein. If they had concluded to take cognizance of the matter, they would have had important duties to perform before they could have caused the money to be levied and collected. The statute required the board to *audit* the estimate of damages. That undoubtedly rendered it necessary that they should examine it, and authorized them, should there be no call upon them by the supervisor of the town or the claimant, to refer it, to make a final settlement of the damages. Their power to do so is apparent from the language of the eighth section of the act which I have just quoted. Now this power, which conferred some discretion on the board, if it has any efficacy whatever, has never been exercised by the defendants in this case. Neither did the matter proceed so far as to authorize the supervisor of the town of Greenburgh, in which the proposed highway is situated, to demand the final reference of the estimate mentioned in the act. It is true that when such estimate was presented to the supervisors, there were no longer three county judges, but an act had been passed, (*ch.* 470 *of the Acts of* 1847, § 27,) conferring upon the county judge the power to perform all the duties, out of court, of the former judges of the common pleas, or of any one or more of them, which they could perform by the laws in force on the 12th of May, 1847. That would have enabled the county judge of Westchester to act on a reference of this matter, had the act of 1845 been in force when the certificate of the amount of damages was presented to the defendants. Now if this view of the case be correct, it

would be manifestly unjust to the tax payers of the town to require them to pay the money without giving them the opportunity to be heard to which they are entitled under the statute. That they would wish to investigate the matter is apparent from the opposition made by them and their supervisor to the relator's claim before the board.   In this view of the case, the equities of the parties are very different.   Should a peremptory mandamus be ordered, the inhabitants of Greenburgh would be compelled to pay the amount of the estimate, right or wrong, and without their being able to obtain any redress ; whereas the relator, should the writ be refused, will still retain his title to his land, have a full remedy for any damage which he may have sustained by the premature use of it as a highway, and can not be compelled to part with it until he shall have been fully remunerated, pursuant to the provisions of the constitution.   In the particular which I have last considered, this case differs from that cited on the argument, of *The People* v. *The Supervisors of Ulster County,* (3 *Barb. S. C. R.* 332.)   There the assessment had been referred by the board of supervisors to three judges, who made a new or corrected estimate, and delivered it to the board, which then had no discretion to exercise in the matter by the express provision of the eighth section of the act of 1845, but were required to cause the amount to be levied and collected as required by law, after a final settlement of damages in such cases by the board.   All that this court could do, if the provisions of the act of 1845 relative to this subject, were in force when the defendants refused to act, would be to issue a mandamus to them, to proceed and exercise the discretion and powers conferred upon them by the act : but I could not do thus much in this case, as the mandamus, if granted, must correspond with the alternative writ, which merely asks for a positive requisition upon the defendants to cause the damages, as already assessed, to be levied and collected.

The rule was so laid down by Judge Bronson, in *The People* v. *The Supervisors of Dutchess Co.* (1 *Hill,* 50,) and it would seem to result from the consideration that the defendants can

only be required to show cause why they have not done what was demanded of them in the primary process.

But I am strongly inclined to the opinion that the provisions of the act of 1845, relative to the assessment of the damages of the owners of land taken for new highways, were abrogated by the constitution, when that took effect on the 1st of January, 1847, which was previous to the commencement of the proceedings in this case. The 7th section of the 1st article provides that when private property *shall* be taken for public use, the compensation to be made therefor, when such compensation is not made by the state, *shall be* ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law. By a clause in the 17th section of the same article all such acts of the legislature, and parts thereof, as are repugnant to the constitution were thereby abrogated. And, indeed such would have been the effect, without any express provision, as " *legis posterioras priores contrarias abrogant.*" The 13th section of the 14th article directs that the constitution should be in force from the 1st of January, 1847, *except as therein otherwise provided.* There are provisions in the constitution expressly postponing the operation of some of its clauses ; but neither of them has reference to that part of the 7th section of the 1st article, which I have quoted. It has been supposed, however, that the provision in that section is wholly prospective ; and necessarily postponed its operation for any purpose until it should be consummated by legislative action. In the case of *The People* v. *The Supervisors of Ulster County*, which I have before cited, the learned judge who delivered the opinion of the court would seem to have adopted that construction. One of the reasons assigned by him is that if the provision should take effect when the constitution went into operation, it would repeal the former act, and there would be an interval between that and the passage of the requisite act of the legislature, when there would be no effectual provision of the law for acquiring private property for public purposes. That would be true ; but the inconvenience could not have been very great, had the legislature acted promptly on the subject, as that

body met on the first Tuesday of the same month, and could, and had the public exigencies required it, no doubt would, have passed the requisite act, without delay. That, therefore, offers but a slight reason to infer that it was designed to postpone the entire operation of the constitutional provision. If, on the other hand, it was not to take effect until the legislature should act, there would, of course, be no limitation of the time ; and that honorable body, should it prefer the old system, might protract it indefinitely. In the absence and consequent want of any effectual provision, there would be every inducement for the legislature to act promptly ; but there might be delay when there was an existing law, framed by the wisdom of their predecessors, which would accomplish the same purpose. There was, undoubtedly, as the learned judge says, a call for legislative action, by the terms " as shall be prescribed by law ;" but that does not necessarily postpone the entire operation of the provision. A direction that an act *shall* be done, in one of two specific ways, may immediately exclude any other ; and such would be the appropriate construction in the absence of any qualifying language, although the selection of either alternative might be devolved upon another. In such case the power to make the change is not devolved upon the legislature. The constitution effects that, *proprio vigore :* it is merely left to the secondary power to carry out the details. No doubt the convention which framed our constitution might thereby have devolved upon the legislature the entire power of making a required change. Then the provision would have been simply mandatory, and in the absence of any express repeal, no change would have been effected until the legislature had acted. Such was the ground upon which the supreme court of the United States decided the case of *Glover* v. *Stoughton*, (15 *Peters*, 449.) The constitution of the state of Mississippi, adopted in 1832, provided that " the introduction of slaves into this state as merchandise or for sale, *shall be prohibited* after the 1st day of May, 1833." That did not contain a prohibition in terms, but directed that one should be made—at least the supreme court so decided—and the same learned court reiterated the decision

The People *v.* Supervisors of Westchester.

in the case of *Rowan* v. *Runnels*, (5 *Howard's U. S. R.* 134,) which went up from the state of Mississippi, where the matter had been decided differently. The language used in the constitution of the state of Mississippi was prospective, and gave more countenance to, if it did not fully support, the construction given to the clause by the supreme court of the United States. But in the case which I am considering, the main direction is immediate; the damages *shall* be ascertained in one of two ways; there is no qualification as to that. If the convention had designed a continuance of the old system until the new one should be perfected, they would have said so, as they did in reference to other provisions of the constitution. They did not do that, but left it to the operation of the general direction that all parts of it should go into effect on the 1st of January, 1847, except as otherwise *therein* provided.

Upon the whole, my opinion is that the provisions relative to the compensation to be allowed to the owners of lands taken for highways, in the act of 1845, were abrogated by the constitution, when that took effect, pursuant to the general provision in the last section.

I am aware that in this I differ from a most respectable authority, but as the lands of the relator in the case to which I allude had been provisionally taken, and his damages had been once, although not conclusively, assessed, previous to the time when the constitution went into operation, and the court relied much upon those facts, that case is not directly in point, and is not considered by me as a controlling authority.

There must be judgment for the defendants upon the demurrer, and a peremptory mandamus is consequently denied. But under the circumstances I shall not award costs against the relator.

[WESTCHESTER SPECIAL TERM, February 2, 1852. *S. B. Strong*, Justice.]